## UNITED STATES DISTRICT COURT

### DISTRICT OF DELAWARE

MARK ANTHONY KIRK            §
    Petitioner

               §

     v.

               §     Cv. A. No. ___1:08-cv-37 JJF___

PERRY PHELPS, Warden,        §
    Respondent

BEAU BIDEN, Att. Gen.        §     Petition for Writ of Habeas Corpus    po scanned
    For the Respondent

               §

**FILED**

FEB 28 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

### MEMORANDUM OF LAW

The above named has filed a petition for *writ of habeas corpus*, pursuant to 28 U.S.C.A. § 2254. This is his memorandum of law in support thereof.

### STATEMENT OF THE CASE

The petitioner was arrested on 5 December 1996, and charged with 1 count of Arson 1st, 3 counts of Felony Murder 1st and 3 counts of Felony Assault 1st. Following a bench trial, Kirk was convicted of Arson 3rd, 3 counts of Felony Murder 1st, 2 counts of Assault 1st, and 1 count of Assault 3rd. Kirk was sentenced to 3 life terms, plus 23 years. The Delaware Supreme Court affirmed.[1]

Kirk filed a Rule 61 motion for post-conviction relief, which was denied.[2] Kirk filed a second motion for post-conviction relief; also denied.[3]

---

[1] *Kirk v. State,* 1999 WL 415802 (Del.)

[2] *State v. Kirk,* 2000 WL 1211214 (Del.Super.), *aff'd, Kirk v. State,* 2000 WL 1637418 (Del.)

[3] *State v. Kirk,* 2001 WL 755942 (Del.Super.), *aff'd, Kirk v. State*, 2002 WL 256741 (Del.)

Having exhausted state remedies, Kirk filed for habeas relief in this Court.[4] Contemporaneously, Kirk filed a third post-conviction motion, based on the Delaware Supreme Court's ruling in *Williams v. State.*[5]   As a result, Kirk was resentenced to 49 years imprisonment.[6]

Kirk filed a fourth motion for post-conviction relief, based on newly discovered evidence, which was summarily dismissed.[7] Having exhausted the state remedies on the newly discovered evidence, Kirk now seeks relief through this Court.

## STATEMENT OF FACTS

In the early morning hours of 4 December 1996, a fire broke out in the apartment occupied by Mark Kirk, Darlene Hamby, and her two children—Jason, age 16 and Brandon, age 10. The ensuing fire resulted in the deaths of Steven Rivera, and his two children—Francis, age 17 and Robby, age 9. (Stipulated)

Kirk and Hamby had been drinking heavily the day before, and both were admittedly intoxicated that night.[8] They had also been arguing, whereby Kirk told Hamby he was leaving her due to her flirtatious behavior.[9] Jason Hamby would later testify that, at one point, Kirk and Hamby had decided to lay their argument to rest and pursue it the next day.

According to fire marshals, relying on 911 calls and eyewitness accounts, the fire occurred at 3:00 AM. The first responder was New Castle County Police Officer J.Wagenhoffer, who observed Kirk and Hamby exiting the building together.[10]

---

[4] *Kirk v. Carroll*, 243 F.Supp.2d 125 (D.Del. 2003), *aff'd, Kirk v. Carroll,* C.A.No. 03–1672 (3rd Cir. 2003)

[5] *Williams v. State*, 818 A.2d 906 (Del. 203)

[6] *State v. Kirk,* 2004 WL 396407 (Del. Super), *aff'd, Kirk v. State,* Del.Supr., No. 72, 2005, Steele, C.J. (Dec. 23, 2005)

[7] *State v. Kirk,* 2007 WL 1446671 (Del. Super), *aff'd, Kirk v. State*, Del. Supr., No. 293, 2007, Ridgely, J. (Dec. 5, 2007)

[8] A–1 thru A–3

[9] A–4

[10] A–5 thru A–10

2

Initial, on-the-scene, investigative questioning of witnesses and victims revealed that Darlene Hamby had accidentally started a fire on her stove.[11] At 5:45 AM, police took Kirk, Hamby, and the two children into custody for questioning. The four were discharged at 3:30 PM; with Kirk being informed that he was to report back the next day for a polygraph examination, or a warrant would be issued for his arrest.

Kirk reported back the next day at 9:00 AM. Following a grueling polygraph interrogation, Kirk was taken to another interrogation room, where he was interrogated over the course of the next several hours. Kirk finally caved in, and gave police a statement; whereby, he recites the account police had describe in detail to him about pouring **70-proof** rum on the electric stove. To bolster the account, fire marshals presented a video tape at trial which purports to demonstrate that 70-proof rum would burn on the electric stove. Even during the course of his statement, Kirk maintained that **70-proof** rum would not burn on an electric stove. Now, ten years later, Kirk has been able to obtain conclusive proof that the rum could *not* have ignited in the manner that fire marshals claimed. Kirk presented his new evidence to the state courts by way of a DVD.

### Note: The new evidence can be viewed at www.mark-kirk.org.

In the state courts, Kirk challenged the authenticity of the fire marshals' taped test burn, as well as the trustworthiness of the statement he gave to police. Kirk was able to demonstrate from the facts in record that Fire Marshal Willard Preston had lied about how much rum was in the bottle depicted in their video.[12] The record also shows that the trial court was alerted to the fact that Preston had blatantly lied about the contents of the bottle in their video.[13]

---

[11] A–11 thru A–14
[12] A–15 thru A–16
[13] A–17

3

Likewise, Kirk also presented clear cut evidence to the state post-conviction courts that revealed that the burner element on the stove in the fire marshals' video had been tampered with, in that, it was glowing *white-hot.[14]* The trial judge even acknowledged that *that* particular burner appeared to be higher than the other burners on the stove, which suggests it had been tampered with.[15]

Kirk also challenged the post-conviction courts to address why the fire marshals had conducted their test in secret—at a private residence, at night—as opposed to the Fire marshals' Facility in Dover, Delaware. Their theory was that a half-pint of 70-proof rum, poured on an electric stove, burnt down an entire apartment building. Why would they jeopardize a residential neighborhood by conducting their test in someone's backyard, at night, with no obvious emergency contingency in place? Again, why all the secrecy? Kirk contended that conducting their test in secret, at the least, suggests disingenuousness.

During the course of Kirk's trial, defense counsel, Raymond Radulski, introduced, Stanley Broskey, claiming that he was an arson expert. The prosecution requested *voir dire,* which was granted. It was immediately determined that Broskey had no fire or arson experience whatsoever, nor had he ever had any training in the field. In fact, the prosecutor called the university that Broskey claimed to be affiliated with and discovered that they had never heard of him. As it turned out, Broskey was no more than a drunk-driving expert, used by counsel in his side-practice cases.[16] After *voir dire,* the trial judge stated unambiguously that Broskey would be allowed to testify merely for the sake of appearances.[17]

---

[14]  A-18 & A-19
[15]  A-20 & A-21
[16]  A-22 thru A-24
[17]  A-25

4

The new evidence that Kirk presented to the state post-conviction courts consists of a DVD depicting a test-burn conducted by John Lentini— a man with impeccable credentials.[18] Lentini replicated the *exact* method that fire marshals claim the fire was started. He did so three times, to establish beyond a reasonable doubt that the rum could *not* have ignited on an electric stove. Kirk's new evidence proves that state actors falsified evidence and committed perjury to obtain a bogus conviction. Simply put, starting a fire with a non-ignitable substance is physically and scientifically impossible.

However, the state courts have rejected this straightforward evidence, and dismissed Kirk's claims with no more than cursory review.

---

[18] A–26 & A–27 John Lentini literally co-wrote the book, *NFPA 1992*, that fire marshals are required to study to become arson investigators. He is also a member of the Cordova Innocence Project Arson Review Committee, and author of *Scientific Protocols of Fire Investigation*, © 2006.

### PROCEDURAL STATEMENT

The petitioner's convictions for the 3 counts of Manslaughter and the 2 counts of Assault 2nd became final when the Delaware Supreme Court's Mandate issued on 12 January 2007. Kirk's motion for post-conviction relief was filed on 21 March 2007; therefore, the state courts ruled that the motion was time barred, pursuant to Super. Ct. Crim. Rule 61(i)(5).

As is the instant petition, Kirk's post-conviction motion was based on newly discovered evidence. Whereas, Delaware's remedy for presenting newly discovered evidence requires a motion for a new trial be filed within 2 years after trial, (Super. Ct. Crim. Rule 33), Kirk's only other remedy was via a post-conviction motion, pursuant to Rule 61. Regrettably, Delaware has never released anyone from prison based on new evidence, even with the advent of new DNA laws. This is substantiated by the case of Jerome Waterman, who, after more than five years since being exonerated through DNA analysis, still languishes in prison after 18 years, for a crime he didn't commit, due to judicial red-tape and hand-wringing. Simply put, Delaware does not recognize *any* newly discovered evidence.

Nevertheless, Kirk has turned to the Federal remedy that is available. Title 28 U.S.C.A. § 2244(d)(1) states:

> A 1 year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. The limitation period shall run from the latest of—
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

6

Kirk's time for which to seek habeas relief would have essentially started the day he discovered that the new evidence *might* have existed. That would have been sometime in May of 2006, when Kirk happened upon an article in the newspaper about arson cases, and the junk science employed to procure them, sometimes by unscrupulous means.[19] Kirk tracked down and wrote the man featured in the article, John Lentini. Mr. Lentini responded to Kirk's letter, and was appalled that Kirk could have even possibly been convicted on such a far-fetched theory that the fire was started with 70-proof rum. Lentini conducted a test in July of 2006, and forwarded copies of it to Kirk's family in late August of 2006. Kirk's motion for post-conviction relief was filed in March of 2007, thus tolling the federal time limitation.

Kirk's situation is similar to that of Zachary Wilson. *Wilson v. Beard,* 426 F.3d 653 (3rd Cir. 2005) It was through a fortuitous discovery through a local news program that Wilson discovered his new evidence 13 years after his conviction became final. Moreover, Wilson, at the time, was not even particularly looking for any new evidence, or actively pursuing his case; unlike Kirk, who has been diligently seeking relief from his wrongful conviction. The *Wilson* court determined that the question of whether a petitioner exercised due diligence is one of fact and context—one that examines the petitioner's actions in light of his or her circumstances. *Wilson,* 426 F.3d at 660-61.

In light of petitioner's being incarcerated and his limited resources, Kirk certainly went above and beyond §2244(d)(1)(D)'s "due diligence" requirement, and, therefore, is within the 1 year time limitation for filing the immediate petition.

---

[19] A–28 (Article from News Journal, May 8, 2006)

7

The next hurdle impeding consideration of Kirk's claims in the Federal Court is the fact that the claims were barred in the state court by independent state procedural rules. Kirk, however, can overcome this impediment if he can demonstrate that the state "process [is] ineffective to protect the rights of the applicant." 28 U.S.C.A. § 2254(b)(1)(B)(ii).

The U.S. Supreme Court has held that habeas courts can consider procedurally defaulted claims if "failure to consider the claims will result in a miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546 (1991) The circuit courts are generally in agreement that procedurally defaulted claims should be heard where a constitutional violation has resulted in the conviction of one who is actually innocent. *Hubbard v. Pinchak*, 378 F.3d 333 (3rd Cir. 2004); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007); *Richmond v. Polk*, 375 f.3d 309 (4th Cir. 2004)

As the *Hubbard* Court explained, "a fundamental miscarriage of justice will remove the bar on claims that have been procedurally defaulted, and actual innocence will show a fundamental miscarriage of justice." *Hubbard*, 378 F.3d at 338, quoting, *Cristin v. Brennan*, 281 F.3d 404, 412 (3rd Cir. 2002). A petitioner can support his allegations of constitutional error with new reliable evidence—whether it is exculpatory scientific evidence or critical evidence—that was not presented at trial; and whether it is more likely than not that no reasonable juror would have convicted him beyond a reasonable doubt in *light of the new evidence*. (Emphasis added) *Schlup v. Delo*, 513 U.S. 298, 316, 115 S.Ct. 851 (1995) The Seventh Circuit, relying on *Schlup*, determined that "no bar exists to the habeas court evaluating whether the [new] evidence is strong enough to establish the petitioner's actual innocence." *Gomez v. Jaimet,* 350 F.3d 673, 679 (7th Cir. 2003)

8

The instant case presents a unique situation, in that, Delaware's rule regarding new evidence requires the motion be filed within two years after trial. However, Kirk's convictions that he is challenging were not reached after a trial, but were judgments entered following a former motion for post-conviction relief that Kirk had filed. Therefore, the state's rule for presenting new evidence was unavailable to him. 28 U.S.C.A. § 2254(b)(1)(B)(i)

Therefore, Kirk had to rely on the state's post-conviction rule, which, as Kirk has pointed out, has never been a remedy for anyone presenting new evidence which establishes actual innocence. *State v. Jerome Waterman*, (Del. Super.) Federal courts review the adequacy of a state law used to preclude federal habeas review *de novo*. *Wright v. Quarterman*, 470 F.3d 581 (5th Cir. 2006)

Consequently, notwithstanding the state impediments to hearing the petitioner's claims, Kirk would ask this Court to next look at the facts of the case, particularly, but not limited to, the new evidence.

## THE EVIDENCE

The prosecution, the trial court, and each of the respective reviewing courts, have all relied almost exclusively on two aspects of this case to uphold the conviction—(1) Kirk's confession, and (2) the issue of flammability. In fact, the state courts virtually all stated that there was "ample evidence", besides the test burn, to support the conviction—namely Kirk's confession; but never enunciating this supposed "ample" evidence, while viewing Kirk's new evidence as merely cumulative. However, a review of the facts reveals that the *only* piece of evidence the state courts can muster to sustain the conviction is Kirk's confession, which Kirk will demonstrate was untrustworthy.

As for the issue of flammability, Kirk has shown numerous points in the record that casts the fire marshals' test-burn video in a dubious light (see pp.3–5, *supra*), which, if counsel had subjected to a reasonable "adversarial testing", would not have stood against a properly conducted test-burn. Indeed, as disreputable as the fire marshals' test-burn was, it only prevailed because of the overall degree of incompetence with which defense counsel's supposed expert had conducted his.

The most glaring example of this is the fact that Broskey had replaced the chrome drip pans on his stove with black ones.[20] Then there is also the question of the amount of rum Broskey used in his test. Broskey utilized approximately 2 tablespoons (<15ml.) of rum for each of his tests,[21] compared to the fire marshals' full 750 ml. used.

The evidence in the record clearly demonstrates that there is simply no comparison between the ineptitude of Broskey's test-burn, *vis-à-vis*, the accuracy and integrity of Lentini's experiment in Kirk's new evidence. In fact, Lentini's experiment is an exact graphic reproduction of just how fire marshals claimed the fire was started—even right down to the aluminum foil lined drip pan.

---

[20] A–29 & A–30
[21] A–31

10

And this is the one key piece of evidence that, according to the trial judge's own unambiguous statement, would have changed the outcome of the trial. The Court, acting as sole trier of fact, ruled:

> "Secondarily, and perhaps *more importantly*, the experiment by Mr. Broskey, and probably the State, did not include aluminum foil lining the drip pans."
>
> "The Court recalls the testimony at trial and accepts the expert testimony [of Fire Marshal Preston] that there would be a greater pooling effect on a drip pan having been lined with aluminum foil."
>
> "The Court is *convinced* that the right front burner drip pan from Darlene Hamby's apartment had been lined with aluminum foil. In fact, the Court recalls clearly that a photograph depicted the remnants of such foil from the burner in question."[22] (Emphasis added)

So, while the petitioner acknowledges that Broskey's credibility alone may not have had "any import on the outcome of the case", the ineptness and inaccuracy of his experiment certainly did. *Id.* Without a doubt, that aluminum foil, so vehemently advanced by Preston to the trier of fact, played a key role in the Court's decision.

In addition to Kirk's new evidence, there is ample evidence in the record that disproves the fire marshals' claim of arson: Both Hamby's testified that the same burner had caught fire the previous week, with Darlene Hamby declaring that the stove was literally a "grease pit."[23] Moreover, an arson sniffing dog scoured the scene and found no signs of arson.[24] The ATF lab found nothing that could be attributed to arson as well.[25]

---

[22] A-32
[23] A-33
[24] A-34
[25] A-35 & A-36

11

## THE CONFESSION

The most damning piece of evidence against the petitioner was his own confession at the hands of police. However, Kirk will demonstrate that the authenticity of his statement to police is dubious, to say the least. First, and foremost, it's moot. Kirk confessed to an impossible act. Kirk's confessing to the Lincoln assassination wouldn't make it so.

Recent developments in technology and science, particularly in the field of DNA analysis, have shown that false confessions occur with astounding regularity. In most cases, it was psychological tactics employed by police, identical to those used against Kirk, which netted these false confessions.[26]

Scrutiny of Kirk's confession shows it to be utterly unreliable and untrustworthy. This is demonstrated by Kirk's new evidence, in that, he could not have possibly used 70-proof rum to start the fire.

Kirk has always maintained that police and fire marshals coerced and manipulated a statement out of him. He was told that he was being charged with first degree murder, and that he was going to die, because he would get the death penalty.[27] Kirk was also told that his refusing to cooperate would only make things worse, and that his interrogators could get the courts to use this against him.[28]

---

[26] A–37 & A–38; See also, *The problem With False Confessions in a Post-DNA World,* 82 North Carolina Law Review No. 3, March 2004, and; *Corroborating Confessions: An Empirical Analysis of Legal Safeguards Against False Confessions,* 1984 Wis. L. Rev. 1121, 1155.
[27] A–39 thru A–44
[28] A–45 thru A–49

Not one single aspect of Kirk's statement was an original product of his own which had not been coaxed by police. The allegation that Captain Morgan Spiced Rum™ was used to start the fire was first introduced by Detective Worthy.[29] Then Kirk was associated with the rum by Worthy.[30] Finally, police outright accuse Kirk of using rum.[31]

It was Detective Kelly who first suggested that Kirk must have tried to put the fire out.[32] It was also Kelly who first suggested that Kirk must have poured the rum on the stove burner.[33] Ultimately, it was Detective McLucas who told Kirk that he must have poured rum all over the stove top.[34]

Later, it was McLucas who tells Kirk that it had been Kirk's idea that he had gone out back of the apartment[35], when, in fact, that assertion was first made by Kelly.[36] Incredibly, this is in stark contrast with the testimony of Officer Waggenhoffer, and the initial statement given to police by Darlene Hamby.[37] These facts strongly demonstrate that Kirk's confession was a complete work of fiction, manufactured by police.

Kirk has also established from the facts in evidence that the authenticity and integrity of the tapes and transcripts of the interrogation are suspect. For instance, both Kelly and McLucas testified that Kirk had been escorted out for bathroom breaks during the course of the interrogation.[38]

---

[29] A–50 Det. Worthy actually began accusing Kirk before the recorded interrogation when he conducted a pre-interrogation disguised as a polygraph examination.
[30] A–51
[31] A–52
[32] A–53
[33] A–54, cf. A–55 & A–56
[34] A–57
[35] A–58
[36] A–59
[37] A–5 thru A–10
[38] A–60 & A–61

13

Detective Worthy, during the course of the interrogation, even reminds Kirk that he had, indeed, been escorted out for the aforementioned breaks.[39] The video, as well as the transcripts, however, clearly show that Kirk *never* left the room even once the entire time of the interrogation. There is not one single instance in the transcripts where Kirk is allowed to leave the room, let alone being escorted out.[40]

The evidence positively shows Kirk *asking* to use the bathroom; and it certainly makes sense that over the course of several hours, Kirk would have had to use the bathroom sometime or other. Noteworthy is the fact that the detectives testified that the transcripts, and the tapes, were complete—"as is"—with nothing edited out. So, this begs the question: if nothing was edited out, where did the bathroom breaks go? These unexplainable factual discrepancies cast grave doubt on the authenticity and integrity of the interrogation tapes and transcripts, as well as the testimony of officers.

---

[39] A-62
[40] A-63 thru A-65

14

## LEGAL ANALYSIS

The determination of a factual issue made by a state court shall be presumed to be correct. That "presumption" applies to factual issues that are "basic, primary or historical"; however, it does not apply to factual findings that are not fairly supported by the record. *Berryman v. Morton,* 100 F.3d 1089, 1094 (3rd Cir. 1996), quoting, *Townsend v. Sain,* 372 U.S. 293, 309, 83 S.Ct. 745 (1963).

Furthermore, a petitioner seeking to introduce new evidence of actual innocence must show that (1) the evidence is such as will probably change the result if a new trial is granted, (2) that it has been discovered since trial through the exercise of due diligence and, (3) that it is not merely cumulative and impeaching. *Wilson v. Beard,* 426 F.3d 653 (3rd Cir. 2005) Kirk's new evidence meets, or exceeds these three requirements, in that (1) it would most likely have changed the outcome of the trial had it been presented to the trier of fact; (2) the evidence has been discovered since trial through exceptional due diligence, and; (3) the evidence is more than merely cumulative and impeaching, in that, (i) it completely undermines confidence in the trial verdict, (ii) demonstrates that Kirk was convicted with falsified evidence and, (iii) that counsel was ineffective. *Wilson,* 426 F.3d at 659.

The right to a fair trial, free from false evidence and perjury, is guaranteed by the United States Constitution. *Jenkins v. Artuz,* 294 F.3d 284 (2nd Cir. 2002) Kirk has presented clear and convincing evidence that fire marshals used falsified evidence, and gave perjured testimony, at his trial. This violates the Fourteenth Amendment's Due Process Clause. It also demonstrates a colorable claim that there was a miscarriage of justice

15

(Kirk's wrongful conviction) because of a constitutional violation (the right to a fair trial) that resulted in the conviction of one who is actually innocent. A conviction based on false evidence cannot stand. *U.S. v. Lipowski*, 423 F.Supp 864 (D.N.J. 1976)

The right to effective assistance of counsel is guaranteed by the Sixth Amendment of the U.S. Constitution. To show ineffectiveness, Kirk must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and, (2) that but for counsel's error, the result probably would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984)

While it's true that the constitution does not guarantee the right to effective assistance of an expert, the failings of the defense expert were a direct result of counsel's ineffectiveness. *Richey v. Mitchell*, 395 F.3d 660 (6th Cir. 2005); remanded, *Bradshaw v. Richey*, 126 S.Ct. 602 (2005); writ grant upheld, *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) "The deficiencies of an expert can be imputed to counsel when counsel has *failed* to adequately research and screen an expert witness. *Richey v. Mitchell,* slip op @ page 18. (Emphasis in original) "Incompetence cannot excuse incompetence." *Id.*

Experts testifying at an evidentiary hearing in *Richey* demonstrated that the technology and experts existed as far back as 1986 to refute the evidence presented in that case. *Richey*, slip op @ page 20. Therefore, there is no excuse why Kirk's counsel could not have secured a qualified and reliable expert, to *properly* perform a test burn, if he had done even a minimal amount of homework. Instead he looked no further than to a DUI expert that he used in his side practice. Kirk's newly discovered evidence shows "that a competent arson expert—fully informed and supervised by competent counsel, using the methods available to him at the time of trial—would have all but demolished the State's

16

scientific evidence" and their entire case along with it. *Richey*, slip op @ 21–22. Hiring a DUI expert to defend against an arson–murder charge in a death penalty case certainly meets the first *Strickland* prong, namely, that counsel's performance fell below an objective standard of reasonableness.

Next, Kirk must show prejudice as a result of counsel's ineffectiveness, namely, that "there is a reasonable probability that, but for counsel's errors, the fact finder would have had a reasonable doubt about [petitioner's] guilt." "A reasonable probability is a probability sufficient enough to undermine confidence in the trial's outcome." *Strickland*, 466 at 695.

If counsel had presented an expert, with supporting scientific evidence such as that found in Kirk's newly discovered evidence, the State's case would have been crushed, plain and simple. The trier of fact couldn't have found Kirk guilty of an impossible act. And since there was no evidence of any other type of accelerant that could have started the fire, the State had no case.[41]

Fire marshals, as well as ATF expert Julie Dolan, testified that other types of accelerants leave a discernable trace of residue, i.e.-gasoline, lighter fluid, etc. None of these mentioned residues was discovered at the scene, by either lab testing or arson sniffing dogs. Therefore, at this juncture, the State cannot change course and claim that perhaps some other type of accelerant was possibly used.

---

[41] A–34 thru A–36

17

By failing to attempt to obtain proper evidence to refute the State's case, counsel essentially abandoned any hope Kirk had of proving his innocence. The Constitution guarantees a criminal defendant the right to present a complete defense. *Crane v. Kennedy*, 106 S.Ct. 2528 (1984); *California v. Trombetta*, 104 S.Ct. 2528 (1984) At this point, Kirk needs to "establish by a fair probability that the trier of fact would have entertained a reasonable doubt respecting guilt." *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616 (1986)[42] Kirk has exceeded the "fair probability" standard with the trial court's own words, found herein, at pages 10–11.. Kirk has thus met the second prong of *Strickland,* namely prejudice, in that, but for counsel's errors, the result of the trial would have been different.

Kirk has maintained since day one, when police first took him into custody, that 70-proof rum wouldn't burn the way fire marshals described. This is common knowledge; but without proof, Kirk was pleading to the wind. Every expert, every layperson, every cognizant person that Kirk has discussed this case with has wondered how he was convicted on such a preposterous theory. Finally, after years of unsuccessful attempts to find proof of his claim, John Lentini was willing to step up and provide the new evidence Kirk needed to prove his innocence.

Most notably is the fact that Kirk's new evidence does more than demonstrate mere "legal insufficiency" but firmly establishes "factual (actual) innocence." *Bousley v. United States,* 523 U.S.614, 118 S.Ct. 1604 (1998)

---

[42] Justice Powell expressed the *Kuhlmann* Court's view by concluding that a prisoner retains an overriding "interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated." *Kuhlmann*, 477 U.S. at 454–55, 106 S.Ct. 2627.

18

This case can best be described by the words of Judge Sarokin: "We must ask ourselves why the current clamor and rush to carry out death sentences, but no similar urgency in freeing one who might be wrongly convicted and confined." "If one's liberty, once unconstitutionally taken, can only be restored after so many years of confinement and confoundment, then the Great Writ will be rendered useless. We should be crying out for the prompt release of those who may have been wrongly convicted and confined."

"Justice delayed is justice denied." *Landano v. Rafferty,* 782 F. Supp. 986, 987, 988 (D.N.J. 1992)

19

新侍

K=Kelly(Detective)
S=Staates (Fire Marshal)
A= Hamby

**Statement: Darlene Hamby**      3      **Case No.·32-96-142759**
**Det. Michael J. Kelly**
-----------------------------------------------------------------------

K    OK.   If your kids tell me that you fix them something to eat,
     OK, would they be lying to me?

A    I wouldn't say that they were.

K    OK, well think about this.   It's something important.   And
     like I said....

A    But see, I was drunk so I really don't remember too well.

S    How much had you, you were drunk before you went to
     Lestardo's?

A    I was feeling good.   I had taken a nap.   See what happened is,
     I had gotten pretty drunk and I pulled into the Skyline Inn.
     I laid down from like 12 o'clock to 2 o'clock.   I took a nap
     in the car.   And I drove home.   So basically I got a nap....

K    You were napping at Skyline?

A    Yeah, I napped at Skyline before 2:30.

K    Where's that?   Which Skyline is that?

A    It's on 13.   It's downstate 13.   Right around the Odessa area
     I believe.

K    OK.   So were you drinking all day?

A    Basically, yes.

S    What were you drinking?

A    Budweiser beer.   I don't remember fixing them anything to eat.

K    OK.   The kids say that you, how do you make turkey sandwiches?
     You're going to make turkey sandwiches.

A    Oh, I did the hot turkey sandwiches.   That's right.   OK, see.
     I did it in the microwave.

K    OK.

A    I laid the turkey down on the bread and I took the gravy out
     and I put the gravy on top of the turkey, laid the bread on
     top, gravy on top of the bread and put it the microwave and
     nuked it.

S    Did you use the stove at all?

$\mathcal{A} -1$

Statement: Darlene Hamby        10          Case No. 32-96-142759
Det. Michael J. Kelly
----------------------------------------------------------------

A    Beer, all beer.

K    OK

A    That's all we did all night.

K    What about a little bit of harder stuff?  Like a bottle?

A    No

K    OK, what about a bottle of Capt. Morgan?

A    Uhhhhh.

K    It's all right.  It's all right.

A    I forgot.  I did.  But I only had a swig, that's it because I
     can't take Capt. Morgan because I got sick on it on like on
     24th-25th birthday and it's like, uhhh.  I think I took a
     little sip and that was it.  I do remember that.  I forgot.

K    Now how big is that bottle?

A    I don't even know.

K    Was it a half-gallon size or....?

A    I don't even know.

S    Did you pick it up?

A    Yeah, but I was drunk.  I can't remember.  I think it was a
     pint.  I keep thinking it was a pint.

K    OK.

A    I keep thinking it was a pint bottle.  It could have been a
     fifth.

K    So how long were those guys there and the four of you
     drinking?

A    I don't know.

K    OK, was it a long period of time?

A    I don't think it was very long.  No more than two hours.

K    OK

$A-2$

Page 41

1    A. Yes.

2    Q. How is it that you remember it was November

3  28th of 1996?

4    A. It was my birthday and Thanksgiving Day.

5    Q. That was approximately a week before the

6  fire?

7    A. Yes.

8    Q. How long had you known Mark Kirk prior to his

9  moving in on November 28?

10    A. I met him on November 8th. 20 days.

11    Q. Do you recall the circumstances of when and

12  where you met him?

13    A. At a bar.

14    Q. So prior to him moving in, you had known him

15  20 days. About just short of a month you had known

16  him before the fire?

17    A. Yes, sir.

18    Q. What would you or how would you describe your

19  relationship with Mark Kirk on December 3rd, 1996?

20    A. Up until the incident. Okay.

21    Q. And he was actually living in your apartment?

22    A. Yes.

23    Q. How would you describe your relationship?

Page 42

1  Friends? Good friends? Acquaintances? How would you

2  describe it?

3    A. With who?

4    Q. Mark.

5    A. Good friends.

6    Q. In fact, you set up housekeeping with him

7  essentially?

8    A. Yes.

9    Q. Directing your attention to December 3,

10  1996 -- let me go back.

11    Would you say at the time of the fire you

12  were in love with Mark Kirk?

13    A. Yes.

14    Q. Now, on December 3rd, 1996, was that a

15  workday for you?

16    A. No.

17    Q. Do you recall when you got up that morning or

18  about what time you got up that morning?

19    A. I don't recall.

20    Q. Did you leave the house at any time in the

21  early part of the day?

22    A. Yes.

23    Q. About what time, if you know?

Page 43

1    A. Before noon.

2    Q. I see. And was there any particular location

3  or was there any place you were going at that time, if

4  you recall?

5    A. Middletown, Townsend.

6    Q. Was there anybody you were visiting or

7  anybody you were going to seeing?

8    A. My girlfriends.

9    Q. Do you know their names?

10    A. Kathy Wolinski and Patty Carroll.

11    Q. Was this a business visit or social visit, if

12  you recall?

13    A. Social.

14    Q. Do you remember what you were going to do

15  with them that day or was there any plan?

16    A. No.

17    Q. You were just going to see your friends?

18    A. Yes.

19    Q. And did you go out with them to any

20  particular location?

21    A. No. I stayed at their place.

22    Q. Whose place?

23    A. Kathy's and Patty's.

Page 44

1    Q. Was -- did you do any drinking at that

2  location?

3    A. Yes.

4    Q. What, if you recall, were you drinking?

5    A. Beer.

6    Q. Do you remember what brand?

7    A. Yeah, Budweiser.

8    Q. And if you do recall, about what time did you

9  start drinking that day?

10    A. It was before noon I arrived at their house.

11    Q. So about the same time you got there, you

12  started drinking Budweiser?

13    A. Uh-huh.

14    Q. Do you have any idea how many Budweisers you

15  had at your friends' house?

16    A. I have no idea.

17    Q. What else -- did you do anything other than

18  drink beer at that location?

19    A. No.

20    Q. Did you go anywhere?

21    A. No.

22    Q. Approximately how long were you drinking at

23  your friends' house that morning?

A-3

| | Page 61 |
|---|---|
| 1 | Q. At some point in time in the evening did Tom |
| 2 | and this other individual leave this apartment? |
| 3 | A. I don't remember them leaving. |
| 4 | Q. At some point in time they weren't there? |
| 5 | A. Tom and -- |
| 6 | Q. This other gentleman that came with you from |
| 7 | Lestardo's. |
| 8 | A. I remember they weren't there, yes, at one |
| 9 | point. |
| 10 | Q. But you don't specifically recall them |
| 11 | leaving? |
| 12 | A. No. |
| 13 | Q. At some point in time it was just you and |
| 14 | Mark in the apartment at least awake? |
| 15 | A. While the guys were still visiting you're |
| 16 | talking? |
| 17 | Q. Let me start again. |
| 18 | Do you remember whether or not Tom, the |
| 19 | person you identified as Tom, this other person whose |
| 20 | name you don't now know, left the apartment? |
| 21 | A. I don't remember them leaving, no. |
| 22 | Q. Was there a point in time when you knew that |
| 23 | they were no longer there? |

| | Page 62 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Okay. And about what time was that? |
| 3 | A. I don't know. |
| 4 | Q. Okay. At this point in time was your son, |
| 5 | Jason, still awake or had he gone to bed? |
| 6 | A. I believe he went to bed by then. |
| 7 | Q. And after they were no longer there, was |
| 8 | there any kind of altercation or disagreement between |
| 9 | you and Mark Kirk? |
| 10 | A. Yes. |
| 11 | Q. What, if you recall, was the nature of the |
| 12 | argument or disagreement? |
| 13 | A. My attentions towards his friends or friend. |
| 14 | Q. As best you recall, what did he say to you |
| 15 | about that at that time in the apartment? |
| 16 | A. At that time -- I can't remember exact words |
| 17 | at that time. Right after they left -- |
| 18 | Q. Do you remember some of the general things he |
| 19 | was saying to you? |
| 20 | A. He told me he couldn't trust me. He called |
| 21 | me a whore, things like that. |
| 22 | Q. Anything else you recall him saying? |
| 23 | A. No. |

| | Page 63 |
|---|---|
| 1 | Q. What was his demeanor or how did he seem when |
| 2 | he said these things to you? |
| 3 | A. He was -- |
| 4 | Q. Was there any emotions? |
| 5 | A. He was very upset. |
| 6 | Q. What was the tone and volume of his voice, if |
| 7 | you recall? |
| 8 | A. His tone was sharp and short. The volume |
| 9 | wasn't real loud. |
| 10 | Q. Did he say anything about whether or not the |
| 11 | relationship was going to continue? |
| 12 | A. No. He -- he -- he wanted to leave. |
| 13 | Q. He said that specifically? |
| 14 | A. Yes. |
| 15 | Q. Did he say anything about whether or not the |
| 16 | relationship was over? |
| 17 | A. Yes. |
| 18 | Q. What did he say, if you recall? |
| 19 | A. He says, it's over, that he was leaving. |
| 20 | Q. Did you believe him? |
| 21 | A. Yes. |
| 22 | Q. Did you do anything to try to persuade him |
| 23 | not to leave? |

| | Page 64 |
|---|---|
| 1 | A. I begged him to stay. |
| 2 | Q. Did you do anything else to try to persuade |
| 3 | him not to leave? Did you have any physical contact |
| 4 | with him? |
| 5 | A. I didn't hit him or anything, no, no. |
| 6 | Q. Did you touch him? Did you hold him? What |
| 7 | did you do? |
| 8 | A. Yeah, maybe tried to hug him, yes. |
| 9 | Q. What was your purpose in doing that? |
| 10 | A. To try to persuade him to stay. |
| 11 | Q. Were you able -- did it seem like you were |
| 12 | able to persuade him to stay? |
| 13 | A. No. |
| 14 | Q. At any point in time did he make any attempt |
| 15 | to collect any of his possessions? |
| 16 | A. Yes. |
| 17 | Q. What exactly, if you recall, did he do? |
| 18 | A. He pulled out the top drawer of his dresser. |
| 19 | Q. What did he do then? |
| 20 | A. He flung that and then he collected -- it was |
| 21 | his underclothes and put them in a bag. |
| 22 | Q. Was he saying anything while he was doing |
| 23 | this? |

A - 4

```
 1        IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

 2            IN AND FOR NEW CASTLE COUNTY

 3                          ●

 4                                      JUN 0 1 1998

 5    STATE OF DELAWARE        )
                               )   BY:
 6        VS.                  )   IN96-12-0754, 0755, 0556
                               )   IN97-01-1773 1774, 1775
 7    MARK A. KIRK,            )   1776
                               )
 8            Defendant )

 9                - - - - -

10
      BEFORE:      THE HONORABLE NORMAN A. BARRON
11

12                - - - - -

13
      APPEARANCES:
14
                  JAMES A. ROPP, ESQUIRE
15                DONALD R. ROBERTS, ESQUIRE
                  DEPUTY ATTORNEYS GENERAL
16                For the State of Delaware.

17                RAYMOND M. RADULSKI, ESQUIRE
                  JAMES W. GARVIN, ESQUIRE
18                ASSISTANT PUBLIC DEFENDERS
                  For the Defendant.
19

20

21

22                - - - - -
                    TRIAL TRANSCRIPT
23                  OCTOBER 9, 1997
```

Page 2

```
 1                  INDEX TO TESTIMONY

 2
      WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS  V.D.
 3
      J. Wagenhoffer    3     11
 4    D. Stamper       15
      J. Hoban         27     34       39
 5    E. Miller        40
      J. Gray          57
 6    S. Wolstenholme  65
      J. Rivera        76     98      111
 7    J. Dolan        113            147      150
      F. Gaworski     152    181     196              157
 8                    161

 9
                   INDEX TO EXHIBITS
10
      State's 14     Gallon can/carpet       123
11    State's 15     Gallon can/carpet       123
      State's 16     Gallon can/carpet       123
12    State's 17     Gallon can/carpet       123
      State's 18     Gallon can/clothing     123
13    State's 19     Gallon can/clothing     123
      State's 20     Gallon can/fabric       123
14    State's 21     Gallon can/swabs        123
      State's 22     Gallon can/debris       124
15    State's 23     ATF Laboratory Report   134
      Defendant's 3  Gaworski report, 12/5/96  183
16

17

18

19

20

21

22

23
```

Page 3

```
 1                    October 9, 1997

 2                    Courtroom No. 102

 3                    10:10 o'clock a.m.

 4    PRESENT:

 5        As before noted.

 6        THE COURT: Good morning, counsel.

 7        MR. RADULSKI: Good morning, Judge.

 8        MR. ROBERTS: Good morning, Your Honor.

 9        THE COURT: The State may call its next

10    witness.

11        MR. ROBERTS: The State calls John

12    Wagenhoffer.

13            JOHN WAGENHOFFER

14        JOHN WAGENHOFFER, having been called on the

15    part and behalf of the State, having been duly sworn

16    according to law, was examined and testified as

17    follows:

18            DIRECT EXAMINATION

19    BY MR. ROBERTS:

20    Q. Good morning, sir.

21    A. Good morning, sir.

22    Q. Where do you work and what do you do?

23    A. New Castle County Police. I'm a police
```

Page 4

```
 1    officer.

 2    Q. How long have you been employed by the New

 3    Castle County Police?

 4    A. A little over three years, July of '94.

 5    Q. In the morning hours of December 4th of last

 6    year, were you working?

 7    A. Yes, sir, I was.

 8    Q. What shift were you on?

 9    A. I believe it was the midnight shift, sir.

10    Q. At some point did you respond to the Beaver

11    Brook Apartments on DuPont Highway?

12    A. Yes, I did, sir.

13    Q. Do you know about what time of the day that

14    was?

15    A. Approximately 0300. That's 3:00 a.m., sir.

16    Q. What did you respond there for?

17    A. For a building fire.

18    Q. About how long did it take you to get there?

19    A. Maybe 90 seconds. I was right there at the

20    13/40 split.

21    Q. When you arrived, what did you observe?

22    A. As I was pulling into the complex, I could

23    see one of the buildings. Like I said, I was pulling
```

A - 5

Page 5

1  into the complex. It looked like it was a tornado.
2  It was an extremely dark cloud over top of this
3  building as I was pulling in. As I got closer, it was
4  larger. Like I said, it was dancing on top of the
5  building, literally. It was Building P.
6      Q. Were you able to determine what that was?
7      A. It was a fire, sir.
8      Q. And were you the first emergency responder on
9  the scene?
10     A. Yes, sir, I was.
11     Q. What did you do when you got there?
12     A. As I was pulling into the courtyard area
13 where Building P is located, I pulled up close to the
14 building, but not blocking the area, because I knew
15 fire apparatus and other units were responding as
16 well. I observed two individuals come out of Building
17 P.
18     Q. Can you describe those persons?
19     A. The defendant, I believe, Your Honor, who is
20 sitting there with the goatee in the dark olive
21 colored shirt, and his -- I believe his wife.
22     Q. Okay.
23     A. They were coming out of the building. They

Page 6

1  told me there's people still trapped inside. I exited
2  my vehicle -- as I parked my vehicle, I ran up to the
3  building, opened the door. Although I did not see
4  fire, the smoke and the heat, it -- it was drastic. I
5  couldn't even go in.
6      Q. Did you attempt to go in?
7      A. Yes, sir, I did. I attempted twice to go
8  into the building.
9      Q. Once you were unable to get into the
10 building, what did you do?
11     A. I ran around to the side of the building
12 toward the rear. And it was at that time I could hear
13 individuals screaming for help. And it appeared to be
14 coming from the top third floor rear apartment.
15     Q. Now, did you hear the yelling for help while
16 you were on the side of the building or rear of the
17 building?
18     A. It was at the side of that building, sir.
19     Q. I'm putting up what has been marked State's
20 Exhibit 5. It's a diagram of the side of the
21 building. Can you describe or come up and point out
22 where you heard voices yelling for help?
23     A. Okay. If this was the entrance --

Page 7

1      Q. That's the front, yes.
2      A. -- to Building P, the screams appeared to be
3  coming from this general area, sir. I would say I was
4  at this area here.
5      Q. Okay.
6      A. And then I ran to the back of the apartment.
7      Q. So you are referring to the window furthest
8  to the right on the diagram on the third floor level?
9      A. Yes, Your Honor, or, yes, sir. I believe
10 it's Apartment X.
11     Q. Apartment X?
12     A. Yes, sir.
13     Q. Could you tell what the screaming -- what the
14 person was saying as they were screaming?
15     A. They were yelling -- it was -- so much was
16 going on, but it was, please help, help me. I
17 couldn't see anybody. It was just pitch-black.
18     Q. Okay. Now, the building itself, it was
19 Building 8?
20     A. Yes.
21     Q. Okay. And what did you observe next?
22     A. I ran around to the back of the apartment or
23 building rather. And the fire was shooting up from

Page 8

1  the ground floor apartment, first floor. And if you
2  were looking from the rear of it, it would be the
3  first floor to the left.
4      Q. Okay. I'm putting up what is marked State's
5  4. Could you show us on the diagram where you saw the
6  fire shooting up?
7      A. Again, if this is the rear of the apartment,
8  the flames were all engulfed in this area here.
9      Q. Okay. And you are referring to the bottom
10 left-hand apartment of the diagram showing the rear?
11     A. Yes.
12     Q. Okay. What did you do after you made these
13 observations?
14     A. I ran back to the front of the apartment.
15 And I scaled the front of the apartment complex
16 because I couldn't go in. So the next best thing was
17 to try to get people out. I scaled the side of the
18 apartment and banged on the second story balcony
19 windows and sliding door. I attempted to go to the
20 third floor, but the third floor was screened off. I
21 couldn't get up there.
22     Q. I'm putting up State's 3, which is a diagram
23 of the front of the building. Can you show us where

Page 5 - Page 8

A · 6

Page 9

1 you went and what balconies you climbed on?
2 A. These are both the balconies, which is the
3 second floor. I climbed up the side and banged on
4 both sides. I got no answer. I didn't know if there
5 was anybody still trapped inside. Climbed back down.
6 I banged on these as well, the first two ground floor
7 apartments.
8    Q. You indicated both apartments on the second
9 floor and both apartments on the first floor?
10   A. Yes. As I said, the third floor I could have
11 climbed, but there was nothing to grab on to because
12 it was screened off.
13   Q. Okay. Now, after you attempted to arouse the
14 residents, what did you do?
15   A. After I did that, I climbed back down. About
16 that time Patrolman Stamper had arrived. Myself and,
17 I gather, a few bystanders that were standing out and
18 I -- I ran to the adjacent apartment right next to it
19 and -- and I evacuated everybody out of that building.
20   Q. Okay. Did you -- other than the defendant
21 and who you believed to be his wife, did you observe
22 anybody else come out of the building?
23   A. No.

Page 10

1    Q. Were you successful getting the occupants
2 out -- of the adjoining building out?
3    A. Yes, sir. I also aroused -- when I was
4 banging the third -- the top apartment -- I don't know
5 what apartment number or letter that was, but two
6 individuals were coming out of the windows. And they
7 were hanging their heads out. I told them to keep
8 their heads out until the Fire Department got there.
9    Q. Was there smoke coming out of different
10 windows of the building?
11   A. It wasn't -- I would say like gray smoke were
12 coming out of the third floor windows where
13 individuals were hanging out, but the door frame
14 itself -- by this time a few minutes had gone by --
15 smoke started puffing at the bottom and around by the
16 frames. And it was dark, black smoke.
17   Q. What action did you take next?
18   A. About that time, when I got everybody out of
19 the building, I ran back. Sergeant Schreiber was
20 there. A few other County officers was there. Fire
21 board was there. They were taking over. And pretty
22 much at that time fire board took over. And I
23 assisted the fire board by getting ladders, helping

Page 11

1 them move hose, whatever they need me to do.
2    Q. Were you later involved in securing the
3 scene?
4    A. Yes, I was.
5    Q. How long were you involved in securing the
6 scene? Do you know?
7    A. I'm not exactly sure. I did document I
8 relieved Corporal Rago at 0650 hours securing the
9 scene. And I was relieved later by Patrolman Eastburn
10 at 0810 hours.
11   Q. So the scene security was maintained?
12   A. Yes. Crime scene tape was placed and
13 officers were posted at different areas.
14      MR. ROBERTS: May I have a moment, please?
15      I have nothing further.
16          CROSS-EXAMINATION
17 BY MR. GARVIN:
18   Q. Good morning, officer.
19   A. Good morning, sir.
20   Q. You indicated that you were the first person
21 to arrive at the scene, at least from the standpoint
22 of professional people responding; is that correct?
23   A. Yes, sir, I was.

Page 12

1    Q. And how long was that -- did it take you from
2 the time you were alerted, or did you happen to drive
3 by and see it?
4    A. No. The call came out via RECOM. And as I
5 stated earlier, I was at the 13/40 split southbound on
6 13. And Beaver Brook Apartments is a stone's throw
7 away. I might have been a minute, maybe 90 seconds,
8 out.
9    Q. And when you arrived, you had already seen
10 what appeared to be a full-blown fire?
11   A. Smoke that is.
12   Q. Smoke?
13   A. Yes, sir.
14   Q. And the first persons you saw you believe to
15 be the defendant and a woman companion?
16   A. Yes, sir, coming out of the building as I was
17 pulling up, sir.
18   Q. And what did they say to you?
19   A. There's people still trapped inside.
20   Q. They said they were trying to get them out?
21   A. No, Your Honor, or, no, sir. I'm sorry.
22   Q. Okay, okay. How was the defendant dressed?
23   A. I believe he had possibly a flannel shirt and

| Page 13 | Page 15 |
|---|---|
| 1 jeans on, but that's speculation. I can't say, yes, | 1 witness. |
| 2 he did, or, no, he didn't. I know he had clothing | 2 MR. ROPP: Yes, Your Honor. |
| 3 on. It was cold that night. | 3 The State would call Officer Don Stamper. |
| 4 Q. Okay. What about the woman? How was she | 4 DONALD STAMPER |
| 5 dressed? | 5 DONALD STAMPER, having been called on the |
| 6 A. I couldn't even tell you. I don't recall | 6 part and behalf of the State, having been duly sworn |
| 7 what she had on. | 7 according to law, was examined and testified as |
| 8 Q. And that was the extent of your confrontation | 8 follows: |
| 9 with these two people? | 9 DIRECT EXAMINATION |
| 10 A. Yes, sir, it was. | 10 BY MR. ROPP: |
| 11 Q. You immediately proceeded to do your job? | 11 Q. Mr. Stamper, would you state your full name |
| 12 A. Yes, sir. | 12 again for the record? |
| 13 Q. Do you remember who the woman was? Did you | 13 A. Donald E. Stamper. |
| 14 ever establish who the woman was that was with them? | 14 Q. By whom are you employed? |
| 15 A. Did I? | 15 A. New Castle County Police Department. |
| 16 Q. Yes. | 16 Q. How long have you been so employed? |
| 17 A. No, sir. | 17 A. Little over three years. |
| 18 Q. Did they come out together? | 18 Q. What is your current assignment with the New |
| 19 A. Yes, sir. | 19 Castle County Police? |
| 20 Q. Or was it one after the other? | 20 A. I'm routine patrol. |
| 21 A. Well, he came out first. She came out right | 21 Q. And in 50 words or less, what do your regular |
| 22 behind him. | 22 duties include? |
| 23 Q. Within -- | 23 A. Traffic stops, respond to normal complaints |

| Page 14 | Page 16 |
|---|---|
| 1 A. Yeah. | 1 that dispatch gives us, direct enforcement, make |
| 2 Q. -- seconds? | 2 arrests, give citations. |
| 3 A. Not even that. They were piggyback, | 3 Q. Were you on regular patrol on December 3, |
| 4 basically right behind each other. | 4 1996? |
| 5 Q. They were escaping the building almost | 5 A. Yes, I was. |
| 6 simultaneously? | 6 Q. Do you remember what shift you were working? |
| 7 A. Correct, sir. | 7 A. It was the midnight shift. |
| 8 MR. GARVIN: One moment, Your Honor. | 8 Q. That starts about when and goes to when? |
| 9 BY MR. GARVIN: | 9 A. It was 12:00 to 8:00. |
| 10 Q. Right after you saw the defendant and the | 10 Q. 12:00 at night till 8:00 in the morning? |
| 11 companion and prior to you responding to other duties, | 11 A. Yes, sir. |
| 12 did you make a determination of whether it was too hot | 12 Q. As part of those duties -- |
| 13 to go in the exit they were coming out of? | 13 A. I didn't hear the question. |
| 14 A. Too hot to go into? | 14 Q. As part of your duties, was there a |
| 15 Q. Right. | 15 particular area you were assigned to that night? |
| 16 A. You mean the front door? Correct, sir. | 16 A. My particular area that night was called the |
| 17 MR. GARVIN: Thank you. No further | 17 31 sector. That included New Castle, Collins Park, |
| 18 questions. | 18 Route 9 area. |
| 19 MR. ROBERTS: Nothing further. | 19 Q. Would Beaver Brook Apartments be in that |
| 20 THE COURT: Thank you, patrolman. You may | 20 particular area you were assigned to? |
| 21 step down, sir. | 21 A. That is central district. That's actually |
| 22 THE WITNESS: Thank you, sir. | 22 the 32 sector. I patrolled the whole central |
| 23 THE COURT: The State may call its next | 23 district, though. |

$A - Q$

Statement:  Darlene Hamby          25          Case No. -32-96-142759
Det. Michael J. Kelly
-------------------------------------------------------------------

      oh God, thanks, you know, like duh, like I forgot my kid.  And
      then I remember Mark being there because I remember Mark
      complaining about his hand.  He had touched the door knob or
      something and burned his hand.

S     That's what he told you?

A     Yeah

S     OK, that he had burned his hand?  Did you see the burn?

A     I could see it was all red.

S     OK, it was all red?

A     Yeah.

S     How did he say he burned it?

A     He said on a door knob.

S     What door knob?

A     I was assuming the front, that's our, front door knob, that's
      on the front door.

S     What other was open?

A     The bedroom door, I would say, would have been open.  And I
      would say the kid's room would be open.  The bathroom...

S     Not in there?  Did he tell you what door he got burned on?

A     No, and I didn't even ask.  I just assumed the front door.

S     Uh-huh.  Now, did he, once he got outside with you, did he
      ever go back in?

A     No.  I don't, see I lost track of him.

K     When you go outside, was there anybody else there?  Was there
      a policeman outside?

A     There was a policeman out there.  That's right and he was
      there too.  Yes, cause the smoke come rolling out and
      everything, really heavy and we were hollering for him, that
      there was people up on the second floor and he was, climbed up
      like and was banging on the windows.

S     Did you try and put this fire out?

A - 9

S= Staates
A= Hamby

Statement:  Darlene Hamby      42       Case No. 32-96-142759
Det. Michael J. Kelly
-------------------------------------------------------------------

lamps, anything like that in the house?  In the apartment?

A   No.  I had some paint.  I have paint.  I have paint in there
    but I don't have no paint thinner.

S   OK.  Do you have any candles that were lit.

A   Well they weren't lit but I do have, did have a candle.

S   OK.  So how do you think the fire started now?

A   I don't know.

S   You don't know.

A   Cause I have been thinking about that and I don't understand
    why the fire happened on the burner.  Cause when you guys
    investigate, you'll see there's no pans on the stove.  Why a
    fire started and there was nobody cooking on the stove, I
    don't understand it.  And we definitely weren't going to be
    eating because we were fighting.  The kids were in bed.

S   OK.  You go outside....tape runs out.

S   So all three of you, are all three of you outside?

A   Not right away.  I didn't see Jason right away.  But I did see
    him because I remember him coming up and saying, I got Brandon
    out.  So I do remember seeing him.

S   Where's Mark?

A   Mark was there with me.

S   OK.  So how soon did he get together with you after you came
    out?

A   Right away.

S   OK.  When did you learn about him being burned?

A   It wasn't until we got into the.......you know it seems to me
    like it wasn't until we got into the car together but yet we
    were already in the hallway together.  So I'm trying to
    think....

S   You were in the hallway with Mark?

A   Not my hallway.  The next building.  Because we were cold.
    Remember I didn't have anything on.

A-10

| Page 241 | Page 243 |
|---|---|

Page 241

1  you, officer.
2           REDIRECT EXAMINATION
3  BY MR. ROPP:
4      Q  Officer, when you were involved in your
5  evidence collection and examination were you acting as
6  a vice officer trying to find evidence of drugs or any
7  other thing?
8      A  Basically, as I was more or less informed
9  of what's going on, we -- at this time we're looking
10 for this or at this time we're looking for this.
11 Wasn't particularly looking for drugs at this time,
12 no.
13     Q  And your investigation was going towards
14 whether or not there was a fire and whether or not
15 there was an unusual cause for the fire.
16     A  Yes.
17     Q  So it wasn't your intent at that point in
18 time to arrest -- your thought to arrest anybody
19 regarding any paraphernalia that may be found.
20     A  Correct.
21         MR. ROPP:  Thank you.
22         I have nothing further of this witness,
23 Your Honor.

Page 242

1          MR. RADULSKI:  No further questions, Your
2  Honor.
3          THE COURT:  Thank you, Officer Murphy.  You
4  may step down, sir.
5          State may call its next witness.
6          MR. ROBERTS:  State calls Detective Robert
7  McLucas.
8          THE COURT:  Detective McLucas, you've
9  already testified, have you not, sir?
10         DET. McLUCAS:  Yes, I have, sir.
11         THE COURT:  And your oath does continue.
12         DET. McLUCAS:  Yes, sir.
13              ROBERT McLUCAS
14         ROBERT McLUCAS, called as a witness by the
15 state, after having been first duly sworn according to
16 law, was examined and testified as follows:
17              DIRECT EXAMINATION
18 BY MR. ROBERTS:
19     Q  Detective, as co-chief investigator in this
20 investigation, did you receive from the fire board and
21 the police dispatching center the tapes of dispatching
22 a nine one one call?
23     A  Yes, I did.

Page 243

1      Q  I'm going to hand you what's been
2  previously marked and stipulated to as state's
3  exhibits ninety-eight and ninety-nine and ask you if
4  you recognize those items?
5      A  Yes, I do.
6      Q  And could you tell the Court what they
7  are?
8      A  These are copies of the nine one one tapes
9  for the RECOM side, which is the police side, and also
10 from the fire board side.  These were provided to me
11 by deputy -- Deputy Chief Streets, and it also has his
12 initials on the tapes.
13     Q  Could you play the first couple of minutes
14 of the nine one one tape or where the calls came in
15 reporting the fire?
16     A  Certainly.
17         (Tape started at 2:56.)
18         THE COURT:  I think it's on fast.
19         (Tape restarted at 2:56 and stopped at
20 2:59.)
21         MR. McLUCAS:  That's the end.
22 BY MR. ROBERTS:
23     Q  Did any of the callers to nine one one say

Page 244

1  that there was a grease fire on a stove?
2      A  No, they did not.
3      Q  Okay, did you investigate a rumor that
4  there was a grease fire at Darlene Hamby's apartment?
5      A  Yes, I did.  I was working with Deputy Fire
6  Marshal Mike Chionchio and it was brought to my
7  attention that there was a rumor circulating that
8  there was a grease fire and I conducted interviews to
9  try to determine where that information was coming
10 from.
11     Q  In the course of your interviews did you
12 interview Darlene Hamby?
13     A  I did not.  Other officers did where she
14 denied making that statement that there was a grease
15 fire on top of her stove.
16     Q  And Jason Hamby, he was also interviewed by
17 the detectives from the New Castle County Police and
18 Fire Marshal's office and denies ever saying that.
19         Did you interview any of the residents in
20 order to track down the rumor?
21     A  Yes, I did.  We initially interviewed
22 Kimberly Rivera, who's the sister of -- sister and
23 daughter of the deceased.  She indicated that she had

$A - 11$

| Page 245 | Page 247 |
|---|---|
| 1 heard that rumor from an Alison Hatfield. She heard<br>2 that there was a grease fire on the stove and water<br>3 was thrown on it.<br>4   Q Did you talk to Miss Hatfield?<br>5   A Yes, I did. She indicated that she had<br>6 heard that rumor and she indicated that the source of<br>7 that was a Mark Ensley, who was the boyfriend of the<br>8 female deceased.<br>9   Q Frances?<br>10   A Yes.<br>11   Q Did you interview Mark?<br>12   A Yes, I did, at the Christiana Hospital.<br>13   Q And what did Mark tell you?<br>14   A He indicated that he had heard that rumor.<br>15 He believed that Jason had told someone that his<br>16 mother had started a grease fire, but he wasn't<br>17 certain where he had heard that from.<br>18   Q Were you able to find anyone who was able<br>19 to tell you with any degree of certainty where they<br>20 heard that there was a grease fire?<br>21   A No.<br>22   Q About how many people did you interview all<br>23 together between both agencies in this investigation? | 1 to his hand, that he said he was burned when he<br>2 touched the door during the fire.<br>3   Q And you've heard previous testimony from<br>4 one of the paramedics who examined him he was unable<br>5 to substantiate that claim.<br>6   A That's correct.<br>7   Q Did you examine the defendant's hands and<br>8 were you able to determine if he was injured in any<br>9 way?<br>10   A I didn't personally examine his hands. I<br>11 was viewing him on a video monitor at the New Castle<br>12 County Police headquarters. We had one of our<br>13 evidence technicians view his hands, take photographs<br>14 of the injuries that he said that he sustained.<br>15   Q Were you able to see any injuries?<br>16   A The injuries that I could see by looking at<br>17 the photographs, it appeared he had a blister on the<br>18 tip of his nose, like had -- like the blister was just<br>19 forming. Hasn't broken at that point. There was an<br>20 injury -- like a broken blister on one of the fingers<br>21 on one of his hands. Those are the only injuries that<br>22 were evident from the pictures.<br>23   Q Okay, I'm going to show you some |

| Page 246 | Page 248 |
|---|---|
| 1   A Myself, personally I interviewed, I<br>2 believe, five people. I'm not certain as to how many<br>3 that Deputy Chionchio interviewed. The majority of<br>4 the interviews I believe that he did. We were both<br>5 present.<br>6   Q And during the course of the entire<br>7 investigation can you estimate how many people were<br>8 interviewed by both the Fire Marshal's office or the<br>9 New Castle County Police from the beginning of the<br>10 investigation to the end, approximately?<br>11   A A dozen to two dozen.<br>12   Q Was anyone able to tell you with any degree<br>13 of certainty that they either know from firsthand<br>14 experience or they heard directly from Darlene Hamby<br>15 or any other resident of that apartment there was a<br>16 grease fire?<br>17   A No one was certain that they had heard that<br>18 comment directly from Darlene Hamby.<br>19   Q Now, the morning of the -- later in the<br>20 morning of December 4 was the defendant complaining of<br>21 any injuries while he was at the county police<br>22 headquarters?<br>23   A Yes. He had complained of having injuries | 1 photographs and ask you to describe what it is you're<br>2 seeing in them.<br>3   MR. ROBERTS: Your Honor, with the Court's<br>4 permission, if the witness could come down with the<br>5 pointer.<br>6   THE COURT: Very well.<br>7 BY MR. ROBERTS:<br>8   Q Officer, I'm showing you what's been<br>9 previously marked as state's exhibit one hundred.<br>10 First off, when was that photo taken?<br>11   A That was taken on December 4th, the day of<br>12 the first interview, the day of the fire.<br>13   Q Okay, are there any visible injuries to the<br>14 defendant?<br>15   A Nothing that really stands out, other than<br>16 his nose looks a little bit redder around his ears,<br>17 looks a little bit redder than perhaps the rest of his<br>18 complexion.<br>19   Q And state's one-o-one, you see any injuries<br>20 that appear to have resulted from a fire?<br>21   A What you can see here on the very tip of<br>22 his nose right around in here is the beginning of a<br>23 blister. It's difficult to see. You can see it |

1    Jason never said that.

2         Q    But there was a rumor to that effect?

3    Someone said Jason said that?

4         A    Someone is saying they heard someone else

5    say it.  It's like kind of a third party rumor type.

6         Q    But there was another rumor though, was

7    there not, to a similar effect?

8         A    That's correct.

9         Q    And in fact, you spoke with a lady named

10   Miss Minner, did you not?

11        A    That's correct.

12        Q    And she indicated that she was in the back

13   of the ambulance with Darlene Hamby and her children

14   and Mr. Kirk?

15        A    That's correct.

16        Q    Do you remember that?

17        A    Yes, I do.

18        Q    And she stated that she asked Darlene Hamby

19   what happened, and Darlene told her that she had a

20   grease fire and that she threw water on it.  Is that

21   correct?

22        A    That is not the whole statement that she

23   made to me, no.

1        Q     Well, you subsequently interrogated her or

2    questioned her more thoroughly.  Do you remember

3    that?

4        A     I talked to her more thoroughly about it,

5    yes.

6        Q     But the initial thing she told you was that

7    she was in the back of the van with Darlene Hamby,

8    her children and Mr. Kirk, and that this lady, Miss

9    Minner, asked Darlene Hamby what happened?

10       A     That's correct.

11       Q     And Darlene told her that she had a grease

12   fire and threw water on it?

13       A     That's what she told me.

14       Q     And then you questioned her more

15   thoroughly.  I think that's what you put in your

16   report.

17       A     That's correct.

18       Q     And she was questioned more thoroughly.

19   That's a quote, right?

20       A     That's correct.

21       Q     And then she stated that after that, well,

22   she honestly couldn't say who told her that?

23       A     She indicated to me that was a very

102

1  was mostly destroyed in the fire?

2      A    That's correct.

3      Q    In your efforts to approximate the conditions

4  that existed during the fire, you would agree, would you

5  not, that you in this test burn, utilized twice the

6  amount of rum that anyone had suggested might have been

7  available in the apartment when this particular incident

8  occurred?

9      A    No.

10     Q    You do not agree with that?

11     A    No.

12          MR. RADULSKI:  May I, Your Honor?

13          THE COURT:  Yes, you may.

14  BY MR. RADULSKI:

15     Q    Now, let me stop you there.  Okay?  Did you

16  take some of the rum out of the bottle before you put it

17  on this there?

18     A    No.

19     Q    You did not?

20     A    No.

21     Q    Okay.  Now, let me stop you there.  Does that

22  not show a half bottle of rum, full bottle first.  Half

23  bottle?

A- 15

1    A    It is a full bottle.

2    Q    Is that the full bottle?

3    A    I believe so, yes.

4    Q    The tape speaks for itself.  Now, was that the

5    extent of the pooling that occurred caused this to

6    ignite?

7    A    I don't understand your question.

8    Q    How much rum would you estimate had been

9    poured on that coil before it ignited?  I can back it up

10   for you if you like.  How much would you estimate had

11   been poured on there before it ignited?

12   A    Maybe an eighth of a pint.

13   Q    A couple of ounces?

14   A    Maybe.

15   Q    Okay.  Would you agree, your testimony was

16   that there was a full pint of rum?  Isn't that in fact

17   what was poured?

18   A    Yes.

19   Q    Okay.  Was it ever indicated in the evidence

20   anywhere that a full pint of rum had been utilized, by

21   any of the witnesses, had been available for use during

22   any incident at the stove?

23   A    No.

1   if I could.

2          THE COURT:  Very well.

3          (Portions of the test burn videotape were

4   played.)

5          MR. RADULSKI:  Your Honor will note the

6   level of the bottle, half full, clearly visible, and

7   note, your Honor, how little rum is poured prior to

8   ignition.  Under their test, no pooling was

9   necessary.  Pooling was not a factor.  The question

10  we have to ask is why, why does the Fire Marshall

11  insist that notwithstanding what is clearly visible

12  on that tape, that the Captain Morgan's bottle was

13  full when it was half full?  Where is the other half?

14  Did they drink it prior to doing the test?  Were they

15  unsuccessful with the first half in starting the

16  fire?  I can't answer those questions, your Honor.

17          But the apparent temperature of the coil in

18  that tape speaks for itself.  And the Fire Marshall

19  didn't bother to measure the temperature of that

20  coil.  I even challenged the Fire Marshall.  Why

21  didn't you go out and try to prove that you were

22  right when I asked him whether or not Captain

23  Morgan's Rum would ignite with a match.  He said, no,

A-17

1    Fire Marshall's video that was -- that you reviewed

2    yesterday.

3        A    Uh-huh, yes.

4        Q    And I think that your testimony was that it

5    was your speculation or conclusion that the stove

6    must have been hooked up to a 480 volt power source?

7        A    Yes.  Yes.  If you add another 120 line --

8    well, you would have to have two 220 lines to add up

9    to 440.  But you see that that is white.  It's

10   glowing white.  There is no shades of red.  It's

11   white hot.  And for the element to go that high, the

12   energy supply would have to be upped.  It would have

13   to be given more electricity to reach that high

14   level.  You will never see that on any electrical

15   stove in your apartment or home.  You just won't.

16   You won't get it from 220.  You will not get it white

17   hot.  You can almost probably read a newspaper when

18   the light is turned off by that element.  You can't

19   do that in your normal stove.

20       Q    What actual testing are you relying upon

21   for that conclusion, Doctor?

22       A    I'm looking at the element and it's white

23   hot.  It has no shades of red.  It's glowing white.

1    And to me, it's approaching its melting point.

2        Q    So it's your visual inspection alone that

3    you are basing that on?

4        A    Sure.  It's obvious.  It's evidence to

5    anybody who -- who has some knowledge of electricity

6    and how metal reacts when it's heated high enough.

7    It caused actually the Captain's -- that Captain's

8    rum to decompose, probably.  It got high enough for

9    it to decompose down to methyl alcohol and methane,

10   which is more easily ignitable.

11       Q    Have you ever hooked up a 240 volt stove to

12   480?

13       A    No.  I wouldn't want to do that.

14       Q    So this is all based upon your visual

15   inspection of that stove?

16       A    Sure.  It's obvious.  It's readily evident.

17   The first time I saw it, I said no stove acts that

18   way.  Your wife or girlfriend could incinerate

19   herself just by coming close to it.  That is white

20   hot. You never see a stove of that nature being used

21   in a home or residence or apartment.  It's just too

22   hot.  It has been made purposely hot for

23   demonstration.

A-19

1          THE COURT:   Okay.   May I ask a question?

2          MR. ROPP:   Yes, Your Honor.

3          THE COURT:   In commenting upon Mr. Broskey's

4    testimony, you said it appeared to you as though the

5    element was raised above where a drip pan would normally

6    -- if there were a drip pan, the burner would be at a

7    level with the top of the drip pan.   Did I miss

8    something there?

9          THE WITNESS:   That was with the hot plate.

10   The hot plate sat up higher than where the alcohol would

11   lay.

12         THE COURT:   Okay.   Looking at this, doesn't

13   that -- isn't that raised up in your experiment?   Isn't

14   this element higher than the top of the drip pan?

15         THE WITNESS:   Actually, what I commented on

16   was that in Doctor Broskey's experiment, the element was

17   irregular and uneven because the drip pan also serves as

18   to secure the element down into it.   And if you look in

19   Doctor Broskey's tape, you can tell that they were

20   irregular and no drip pan holding it in.

21         THE COURT:   In any event, I also recall you

22   saying that the higher the element the less likely you'd

23   have a fire.

A - 20

1          MR. ROPP:  Objection.  That is far beyond the

2    scope of the State's examination.

3          THE COURT:  He did show -- well, I'll allow

4    it.

5    BY MR. RADULSKI:

6       Q    You'll agree that the element appears white it

7    is that hot?

8       A    I'll have to look at it.

9            Doesn't appear white.  It's due to the

10   lighting probably of the video camera may have reflected

11   on there.  I was there.  It certainly was red.

12      Q    Okay.  Now looks red a bit around the bottom,

13   but your testimony is that you believe that's white

14   rather than red?

15      A    My testimony?

16      Q    Red rather than white?

17      A    My testimony was I was there and it was red.

18      Q    Was there any reason why this burner appears

19   to be sitting up as high as it is?

20      A    It was secured in place.

21      Q    Would you agree that it appears to sit up

22   higher than the other burners that are contained on this

23   stove?

A - 21

Broskey-Voir Dire                               59

1    BY MR. ROPP:

2        Q    Mr. Broskey, I was listening to your

3    testimony on direct examination, and you were asked

4    about toxicology and/or forensic -- was it forensic

5    toxicologist?

6        A    I have been a forensic toxicologist, yes.

7        Q    And I think you described that as any

8    matters that have to do with scientific matters that

9    come in before a Court.  Is that a fair paraphrase of

10   how you described that?

11       A    No.  The question to me was what is

12   forensic science.

13       Q    Do you consider yourself an expert on any

14   scientific matter that comes before a Court?

15       A    Not on any matters, no.

16       Q    What specific degrees do you have in fire

17   or arson investigation?

18       A    I don't have any degrees in fire or arson

19   investigation, but I have taught criminalistics and

20   that is part and parcel of that particular --

21       Q    Fire and arson investigation is part and

22   parcel of criminalistics?

23       A    Criminalistics, yes.

1      Q      You said you taught that course?

2      A      Yes, I did.

3      Q      What percentage of that course was dealing

4    with fire and arson investigation?

5      A      Somewhere between 10 and 15 percent.

6      Q      Are you a member of any fire and arson

7    investigation societies?

8      A      No.

9      Q      Any professional organizations dealing with

10   fire and arson investigation?

11     A      No.

12     Q      Do you have any courses in fire or arson

13   investigation?

14     A      No.

15     Q      I have looked over your curriculum vitae.

16   Do you list any fire and arson investigation

17   expertise?

18     A      Not really, no.

19     Q      Do you have any training whatsoever in the

20   cause or origin of fires?

21     A      Do I have any what?

22     Q      Specialized training in the cause or origin

23   of fires?

1    used to do this test about --

2        Q    I think I asked you, sir, about specific

3    tests that you are aware of in the area that are

4    authoritative.

5        A    Authoritative as to what aspects?

6        Q    Fire investigation or cause and origins of

7    fires.

8        A    I have just read papers concerning that.

9        Q    Are you familiar with the National Fire

10   Protection Association?

11       A    I know it exists.

12       Q    Have you reviewed their manual or guide for

13   fire and explosion investigations, NFPA 9921?

14       A    No, I haven't.

15       Q    I think you testified that you have

16   testified in 40 or 50 different states.  Is it fair

17   to say --

18       A    I said 40 out of 50.

19       Q    Excuse me.  40 out of 50?

20       A    I didn't say 40 or 50.

21       Q    Thank you.  40 out of 50.  Is it fair to

22   say the great majority of those are in DWI or

23   chemical dependency cases?

1    asking somebody to pour some alcohol on top of a

2    stove top.  This man is being asked to give expert

3    testimony.  He needs to have some expertise in the

4    area, and he has not established that.

5              THE COURT:  Would counsel approach.

6              (The following discussion took place at

7    sidebar:)

8              THE COURT:  In my many years of being a

9    Judge in this Court, it's my impression that Dr.

10   Broskey, if he qualifies as an expert, does so by the

11   skin of his teeth.  This has been a very, I think,

12   error free trial, so although I share many of the

13   concerns expressed by the State, I'm going to allow

14   him to testify.  Rule 702 has always been, in my

15   view, a pretty broad rule.  He has some knowledge,

16   experience in the field about which he's going to

17   testify.  I'm going to let him testify.  At the same

18   time, his testimony is open to full cross

19   examination.  And the comments I have made would also

20   suggest that I'll give his opinions the weight I

21   think they deserve.

22             MR. RADULSKI:  Thank you, your Honor.

23             (End of sidebar discussion.)

A-25

1
2
3
4
5
6
7
8
9    **The Authors**
10
11   **John J. Lentini** is a certified fire investigator and chemist with 32 years experience in forensic
12   science and fire investigation. Since 1978, he has managed the fire investigation division of
13   Applied Technical Services, Inc., an independent consulting firm in Marietta, Georgia.
14
15   Mr. Lentini has personally investigated more than 2,000 fire scenes, and has been accepted as an
16   expert witness on more than 200 occasions. He is the immediate past chairman of ASTM
17   Committee E30 on Forensic Sciences. Since 1996, he has been a member of the National Fire
18   Protection Association (NFPA) Technical Committee on Fire Investigations, where he represents
19   ASTM Committee E30. His textbook, *Scientific Protocols for Fire Investigation*, was published
20   by CRC Press in January 2006. Mr. Lentini's resume can be downloaded at www.atslab.com.
21
22   **Daniel L. Churchward** has been investigating fires since 1972 as a sheriff's deputy, fire fighter,
23   insurance company Special Investigations Unit member, and privately employed forensic
24   engineer. He is a graduate of Purdue University with a B.S. in Electrical Engineering
25   Technology.
26
27   Since 1995, he has been the owner and president of Kodiak Enterprises, Inc. He is a charter
28   member and the current Chairman of the NFPA Technical Committee on Fire Investigations
29   responsible for NFPA 921, *Guide for Fire and Explosion Investigations.* Mr. Churchward has
30   qualified as an expert in fire investigation in both state and federal courts and has served as an
31   expert for the court as well. He has investigated approximately 2500 fires in his 34 years as a fire
32   investigator. Mr. Churchward's resume can be downloaded at www.kodiakconsulting.com.
33
34   **David M. Smith** is a certified fire investigator with over 35 years of experience. He began his
35   career in law enforcement in 1968 and served as a bomb technician and arson/homicide
36   detective. Since 1981 he has owned and managed Associated Fire Consultants, Inc., a private
37   firm specializing in fire and explosion investigations in Tucson, Arizona.
38
39   Mr. Smith has been accepted as an expert witness numerous times throughout the United States
40   and Canada and actively lectures regarding fire investigation matters in Australia, New Zealand,
41   the United Kingdom and the United States. He is a past-president of the International
42   Association of Arson Investigators (IAAI) and has represented the International Fire Service
43   Training Association as a Principal member of the NFPA Technical Committee on Fire
44   Investigations since 1992. Mr. Smith's resume can be downloaded at www.assocfire.com.
45

1  **Douglas J. Carpenter** has been investigating fires since 1996 as a fire protection engineer. He
2  holds an A.S. in Mechanical Engineering from Vermont Technical College, a B.S. in Mechanical
3  Engineering from the University of Vermont with and an M.S. in Fire Protection Engineering
4  from Worcester Polytechnic Institute. He is a registered Professional Engineer (P.E.) in the State
5  of Maryland and a Certified Fire and Explosion Investigator.

6

7  Since 1998, he has been vice president and principal engineer with Combustion Science &
8  Engineering, Inc., an independent consulting firm in Columbia, MD. He is an alternate member
9  of the NFPA Technical Committee on Fire Investigations responsible for NFPA 921, *Guide for*
10 *Fire and Explosion Investigations*. Mr. Carpenter has qualified as an expert in the areas of fire
11 origin and cause investigation, fire dynamics, fire reconstruction, and computer fire modeling, in
12 both state and federal courts. He has numerous publications in the areas of fire protection
13 engineering and fire investigations, and has developed and frequently teaches courses for the
14 Society of Fire Protection Engineering and other professional organizations. Mr. Carpenter's
15 resume can be downloaded at www.csefire.com.

16

17 **Michael A. McKenzie** is a trial attorney licensed to practice law in the State of Georgia. He
18 received his J.D. from the Mercer University Walter F. George School of Law in 1977. He has
19 coordinated the investigation of fires for clients since 1979 and has tried to verdict approximately
20 35 alleged arson cases. He provided the fire litigation expertise for the defense in the case of
21 *Georgia v. Weldon Wayne Carr.*

22

23 Mr. McKenzie practices with the firm of Cozen O'Connor in Atlanta, Georgia. He has lectured
24 frequently on topics involving arson and fraud throughout his 29 years of law practice. Mr.
25 McKenzie's resume can be downloaded at www.cozen.com.

A-27

Ex. A-28

# Arson convictions fraught with flaws, experts say

## Bad science blamed for Texas man's execution

**By ROBERT TANNER**
Associated Press

We hear it after a smoky blaze that destroys a house, or an all-night warehouse inferno: The cause of the fire is under investigation.

Now those investigations themselves are getting a hard look, including the case of a Texas man executed two years ago for a house fire that killed his three little girls. Fire experts say he was wrongfully convicted because junk science was accepted as expert testimony.

More than 3,000 people are imprisoned nationwide for arson, and at least some are likely to have been wrongfully convicted, said five experts who analyzed testimony in the Texas case. The experts included veteran arson investigators and people with backgrounds in science and engineering who have taught other investigators.

"It's an unspeakable error and peo-

ple don't want to admit they made that error," said John Lentini, one of the arson experts. "It means you might've sent someone to prison based on bad science. It means you might've caused a family to lose their life savings, based on bad science."

Lentini and his colleagues concluded bad science was at the heart of the testimony that led to Cameron Todd Willingham's conviction for a 1991 fire in Corsicana, Texas. Willingham maintained his innocence up to his execution in 2004.

The experts, along with The Innocence Project, a New York-based group that seeks to uncover wrongful convictions, presented their study on Tuesday to a family Texas commission set up to examine forensic misconduct.

The problems with arson convictions could be huge. The Innocence Project commissioned the panel to study Willingham's case, but said its network



AP/HARRY CABLUCK
**Eugenia Willingham, Cameron Todd Willingham's stepmother, tried unsuccessfully to block his execution.**

of state projects around the country is reviewing other arson convictions.

Willingham's case stands out because he was executed. A few others are now on death row for arson murders, but the

majority are serving prison terms. The Bureau of Justice Statistics counted 5,405 people imprisoned as of 2002 for arson, but the bureau only collected data from just over half the states.

Among the testimony flaws against Willingham:

• Gasoline-fueled fires burn hotter than wood fires, and melted aluminum in the house proved it was intentionally set. Wrong, gas blazes aren't necessarily hotter, the experts said.

• "Crazed" glass, a spidery cracking of glass, which investigators testified proved the presence of a hotter fire caused by an accelerant like gasoline. Experts now believe cracking may take place when water is sprayed during firefighting, or if the glass is struck.

• Investigators testified that the fire had "multiple origins," which would imply that it was intentionally set. The experts who reviewed the testimony said there was no credible way to determine that.

Those ideas were "a hodgepodge of old wives' tales" accepted as fact with

out any scientific support, said Gerald Hurst, a private arson investigator trained as a chemist.

The mind-set began to change with a fire investigation study commissioned by a federal panel in 1977. But the real revolution came in 1982, when the nonprofit National Fire Protection Association issued a consensus document on fire investigations that discredited many long-accepted techniques.

Still, it took years before the community of fire investigators accepted it. The International Association of Arson Investigators finally endorsed the findings of the 1982 document, known as NFPA 921, in 2000.

Even so, reluctance to embrace the modern approach persists, said David M. Smith, a fire investigator in Tucson, Ariz. That means a lot of investigations may have been built on shoddy science, said Smith.

"If there is a fire and you get out and the rest of your family perishes, there's a pretty darn good chance you'll be arrested for arson and murder," he said.

A-28

1          THE WITNESS:  That's correct.

2          THE COURT:  You mentioned something about a

3    reflection piece of the puzzle being the chrome being

4    the fact that the drip pan is chrome.

5          THE WITNESS:  That's correct.

6          THE COURT:  Would the same apply if you had

7    aluminum foil in there?

8          THE WITNESS:  What the aluminum serve to do,

9    it depends on the placing of it, it would plug up some

10   of these holes and assist in the pooling.  If the

11   alcohol was poured into it, it would come in through the

12   hole in here and possibly over here where the element

13   plugs in.  If there's aluminum foil wrapped around it

14   would assist in plugging that and you wouldn't lose as

15   much alcohol through those holes.

16         THE COURT:  I heard that testimony before but

17   now that we're on this reflection aspect, I recall in

18   the interim I think Mr. Broskey said that the drip pans

19   on his Frigidaire were black or something like that?

20         THE WITNESS:  That's what he testified to,

21   yes.

22         THE COURT:  So would it follow then that there

23   would be no reflective effect then with such a color?

A - 7 a

86

1              THE WITNESS:  You would get more absorption
2    with a black drip pan I would imagine then that
3    reflected from the chrome, yes.

4              THE COURT:  Okay.  I'm sorry, Mr. Ropp.

5              MR. ROPP:  Thank you, Your Honor.

6    BY MR. ROPP:

7         Q    I think we were going to move in that
8    direction in any event.

9              Did you make any observations with regard --
10   before I get to that, with regards to the recreation or
11   the test burn that you did, did you make any attempts
12   to, with regards to particular burner and voltage, try
13   to approximate what was at Beaver Brook Apartments?

14        A    Yes.

15        Q    How did you do that?

16        A    We checked.  We had an electrical man go down
17   there and find out what exactly was at Beaver Brook
18   Apartments.

19        Q    That was 120/240?

20        A    Yes.

21        Q    Did you check before doing the test burn at
22   Deputy Statt's residence?

23        A    Yes.

A-30

1    the stove were you pouring it?

2              Answer:   I was just kind of like shaking it

3    out of the bottle.

4              Was it going all over the place?

5              Um --

6              Show me how you would have been doing it.

7              Answer:   Like this.   I was just shaking it

8    out of the bottle, just like that, and it probably

9    splashed every damn where.

10             Is that what you recall of the testimony?

11        A    That's what's written here, yes.

12        Q    Is that how you did your recreation on the

13   stove top?

14        A    No.   I had to be conservative for what I

15   poured on there, but it still will not conflagrate if

16   you just pour it on the burner from my --

17        Q    So you used something less than a half a

18   pint of Captain Morgan's Rum in either of your tests?

19        A    I used practically all that was supplied to

20   me.

21        Q    How many tests, Doctor?

22        A    Three -- at least seven or eight times.

23        Q    So you took the bottle and you made seven

1          Stated  differently,  I  suppose,  do  the
2      interests  of  justice  mandate  that  a  new  trial  be
3      ordered?  And  the  Court  concluded  that  the  result  of  the
4      trial  would  not  have  been  different  had  the  Court
5      accepted  the  results  of  Mr.  Brosky's  test.

6          First  of  all,  the  test  that  Mr.  Brosky
7      performed  via  the  videotapes,  was  basically  offset  by
8      the  state's  experiment,  which  was  also  offered  by  way  of
9      a  video  tape.  In  other  words,  each  negated  the  other.

10          Secondarily  and  perhaps  more  importantly,  the
11      experiment  by  Mr.  Brosky,  and  probably  the  State,  did
12      not  include  aluminum  foil  lining  the  drip  pans.

13          The  Court  recalls  the  testimony  at  trial  and
14      accepts  the  expert  testimony  presented  at  trial  that
15      there  would  be  a  greater  pooling  effect  on  a  drip  pan
16      having  been  lined  with  aluminum  foil.  A  greater  pooling
17      effect  would  enhance  the  ignition  of  an  accelerant.

18          The  issue  of  Dr.  Brosky's  credibility  was  not
19      really  an  issue  that  had  any  import  on  the  outcome  of
20      this  case.

21          The  Court  is  convinced  that  the  right  front
22      burner  drip  pan  from  Darlene  Hamby's  apartment  had  been
23      lined  with  aluminum  foil.  In  fact,  the  Court  recalls

$A - 32$

1    I have never done it, but I believe it would.    And

2    that's it.   He didn't take the challenge.

3              The problem with the Fire Marshall's

4    testimony is that there are lots of conclusions that

5    are drawn and very little basis explained to support

6    those conclusions.   The bottom line is they have not

7    proven beyond a reasonable doubt that Captain

8    Morgan's Rum will ignite under the circumstances

9    found in the apartment.   They didn't ask Professor

10   Broskey about the drip pans because they didn't want

11   to give him an opportunity to explain what you saw in

12   the film.   They would rather attack him after he's ·

13   gone, without an opportunity to respond.

14             And they want you to ignore the fact that

15   one week before the fire, the very burner in question

16   had an unexplained fire.   And according to Darlene

17   Hamby's statement, that stove was not fully cleaned,

18   and I believe her statement was to the effect that it

19   was a real grease pit in there, and because I'm

20   working so often, I did not have time to keep that

21   stove cleaned.

22             We know that Darlene Hamby is the person

23   who discovered the fire.   No one saw the defendant

$A - 33$

Page 65

1 evidence detection you did with the use of Yoyo, the
2 canine, about what time did you come into the -- let
3 me back up.
4 Did you actually take Yoyo into Beaver
5 Brook Apartments, apartment eight P, which you, I
6 think, previously described as the apartment of
7 origin?
8 A Yes, I did.
9 Q Okay. And, if you recall, about what time
10 did you do that, roughly?
11 A I think it was approximately nine
12 forty-five a.m.
13 Q Okay, and at this point in time was the
14 fire essentially under control at that point,
15 essentially mostly out?
16 A Yes, it was.
17 Q I notice during the -- during your scene
18 video -- about what time was that done if you recall?
19 A That was started -- segments of it was
20 started probably as early as seven, eight o'clock in
21 the morning.
22 Q And I know there appeared to be smoke. Was
23 it -- were there things still smoldering and smoking

Page 66

1 at the time you did that particular video?
2 A Yes.
3 Q Sometime maybe an hour and a half later you
4 took the dog into the premises.
5 A Yes.
6 Q Would you describe how you conducted the
7 scene search with Yoyo?
8 A When I conducted this particular scene
9 search I took her in the apartment through the front
10 entrance, down the step to -- steps to the first floor
11 and down the hallway to the right and into apartment
12 P. Took her in and just let her have -- we call it
13 letting her have her head. Means she takes me on the
14 initial search. She led me through just sniffing as
15 she went. Again, at the front door I start around the
16 right side of the room, the living room. Cross the
17 living room. She showed no particular interest in any
18 spots.
19 Then we went into the kitchen, and she
20 alerted three separate times on the floor in front of
21 the stove.
22 Q Now, was there any particular material in
23 the area where she alerted on the floor?

Page 67

1 A Yes, there was. There was like a small
2 throw rug.
3 Q Okay, and once again, she alerted by
4 sitting down at that particular location?
5 A Yes.
6 Q That's the first place she sat down in the
7 apartment?
8 A Yes. She sat down. Once I take her out of
9 the kitchen, take her back again in a couple of
10 minutes, same thing. She would alert. Take her out.
11 Back in, another alert.
12 Q So three times she alerted on this area in
13 front of the stove in the kitchen?
14 A Yes.
15 Q Did you make any attempts to collect that
16 throw rug that you talked about that was in front of
17 the stove?
18 A Yes, we did.
19 Q And what, if anything, did you do with that
20 throw rug?
21 A Due to the size of it, we had to cut it
22 into like four separate pieces. We took each piece
23 and put them in a new one gallon paint can and sealed

Page 68

1 the lids.
2 Q And what was the purpose of putting it in a
3 sealed new paint can like that?
4 A It's been found that the paint cans hold
5 any vapors of flammable or combustible liquids inside
6 the can while they're being transported to the lab and
7 while they're being examined.
8 Q And just so I'm clear on this, when the dog
9 sat down and alerted in that respect to that area,
10 would you have any way of knowing, from working the
11 dog, which, if any, of the accelerants it may have
12 been that she smelled?
13 A No.
14 Q Okay, so could have been Acetone, gasoline,
15 alcohol, any of the list of the accelerants that you
16 indicated?
17 A That's correct.
18 MR. ROPP: Can the witness step down, Your
19 Honor?
20 THE COURT: Yes.
21 BY MR. ROPP:
22 Q Let me show you what's been previously
23 marked as -- appears to be nine paint cans, and ask

A - 911

A T F  L a b

J u l i e  D o l a n - 10-9-97

Page 137

1  A. Ethanol has a wide variety of uses. And if
2  it appears in a publication such as that, it's
3  probably been used for those applications.
4  Q. What about cleaning -- excuse me -- cleaning
5  preparations? Is it found in that as well, those as
6  well?
7  A. There are some cleaning preparations that
8  contain ethanol, yes.
9  Q. How about surface coatings?
10  A. Again, I'm not a surface chemist. So I don't
11  know specifically.
12  Q. Cosmetics?
13  A. I don't have specific knowledge of the
14  cosmetic formulation.
15  Q. Old Spice?
16  A. I imagine that would have it.
17  Q. Brut? Any after-shaves of that nature?
18  A. Yes, it probably would be found in those.
19  Q. Antifreeze?
20  A. My recollection of antifreeze is the bulk of
21  those are ethylene glycol.
22  Q. But if Mr. Hawley says it's an antifreeze,
23  would you have any reason to dispute him?

Page 138

1  A. I --
2      MR. ROPP: Your Honor, I object. I don't
3  know if this has been established as a authoritative
4  text in any particular industry. I don't mind him
5  reading and asking questions from it, but if he is
6  acting as an expert to say some learned treaties, I --
7  I think that's improper.
8      MR. RADULSKI: I'm allowed to ask the witness
9  if she is aware of this publication, does she have any
10  reason to dispute the accuracy of the publication. I
11  think the questioning is fair game.
12      THE COURT: What is the publication?
13      MR. RADULSKI: It's Hawley's Condensed
14  Chemical Dictionary, Seventh Edition.
15      THE COURT: Have you ever heard of that?
16      THE WITNESS: We use a condensed chemical
17  dictionary, but I don't know if that's the exact one.
18  I'm --
19      MR. RADULSKI: May I show her? I have a
20  photocopy of the cover. Maybe that will refresh her
21  memory.
22  BY MR. RADULSKI:
23  Q. Does that look familiar?

Page 139

1  A. It's -- it's not a chemical dictionary that I
2  use, but I mean I --
3  Q. There are more than one?
4  A. Right.
5      THE COURT: All right. You may.
6      MR. RADULSKI: Thank you.
7  BY MR. RADULSKI:
8  Q. How about beverages? Ethanol is found in
9  beverages?
10  A. Yes, it is.
11  Q. Alcoholic beverages?
12  A. Yes.
13  Q. Okay. And I take it that from your analysis,
14  other than the chemical ethanol, you don't know what
15  product it came from in that one sample out of the
16  nine that you tested.
17  A. That's correct.
18  Q. It could have been any of the laundry list of
19  things that I just recited to you, assuming Mr. Hawley
20  is correct?
21  A. That's correct.
22  Q. Okay. And there is ethanol in beer?
23  A. Yes, there is.

Page 140

1  Q. Okay. There is ethanol in wine?
2  A. Yes, there is.
3  Q. Whiskey?
4  A. Yes.
5  Q. Rum?
6  A. Yes.
7  Q. Champagne?
8  A. Yes.
9  Q. Okay. All these items. But you don't know
10  from your testing or expertise what particular product
11  furnished the ethanol -- the minute quantity of
12  ethanol that was found on your piece of carpet in can
13  three?
14  A. That's correct, I did not determine the
15  origin.
16  Q. And if I understand your testimony correctly,
17  you don't know when that quantity of ethanol that you
18  are talking about ended up on the piece of carpet that
19  was sent to you.
20  A. That's correct.
21  Q. Other than if it's -- if it's -- if it's a
22  lesser amount, under certain conditions, it's going to
23  disappear faster than a swimming pool full?

A - 2 5

Page 141

1 A. That's correct.
2 Q. You don't know when?
3 A. That's correct.
4 Q. Okay. Do you have any idea how the ethanol
5 in question appeared on the carpet in Exhibit No. 3?
6 A. No, I do not.
7 Q. Okay. Now, you mentioned residues -- that
8 you can test for residues of ethanol or other items.
9 A. That's correct.
10 Q. Okay. And a residue would be something
11 that -- not a piece of carpet, but it would be
12 something else that -- perhaps a swab of an area and
13 something adheres to the swab and you can test that to
14 determine whether or not one of the things you are
15 looking for is on that item; is that correct? Is that
16 a proper use of the term "residue"?
17 A. The main reason the term "residue" is used so
18 commonly in the fire debris industry or in the
19 analysis of fire debris is because many of the things
20 we do examine are multicomponent mixtures, something
21 like gasoline, and what we identify in those cases
22 wouldn't be gasoline, but residue of gasoline, because
23 portions burned off. When we say residue, we mean

Page 142

1 what's left behind.
2 Q. Okay. Incidentally, one of those nine cans
3 that were sent to you contained a swabbing from the
4 top of the stove in the subject apartment. Do you
5 remember that?
6 A. Yes.
7 Q. Okay. And that was negative for any ethanol;
8 correct?
9 A. That's correct.
10 Q. Now, is it sometimes the case that you are
11 sent various types of items from a fire scene from
12 which you extract, if you can, the chemicals you are
13 looking for, the product you are looking for?
14 A. That's correct.
15 Q. You'll get dirt sometimes; won't you?
16 A. Yes, we do.
17 Q. Wood?
18 A. Yes, we do.
19 Q. Burnt wood?
20 A. Yes.
21 Q. Could you be sent other materials, like
22 plastics, things of that nature, to see whether or not
23 there is a residue still on them?

Page 143

1 A. Yes.
2 Q. Glass?
3 A. Yes.
4 Q. So you could be sent a piece of broken glass
5 to determine from that glass whether or not there is
6 this product on there --
7 A. That's correct.
8 Q. -- that you're looking for? Metals?
9 A. Conceivably, yes. It's not something
10 commonly seen.
11 Q. Now, you talked about the dog and being or
12 canines being used to look at a scene or sniff a scene
13 and try to direct the investigators to a particular
14 location or another; is that correct?
15 A. I wouldn't say necessarily they would direct
16 them. I wouldn't like to think the investigator was
17 directing the dog, but they can help them pinpoint
18 areas in which they may -- there may be -- may be an
19 indication of flammable or combustible liquid, an area
20 to take a sample.
21 Q. Now, you indicated -- I guess you don't
22 understand how dogs do it.
23 A. I have some familiarity with the training

Page 144

1 that the canines go through, that they are trained to
2 alert on certain flammable and combustible liquids.
3 Q. But science doesn't know what it is about a
4 dog that can cause them to pick up a suspect item and
5 be able to direct investigators to it?
6 A. No.
7 Q. Now, you indicated, though, that there's some
8 sort of studies that suggest that perhaps dogs can
9 sometimes pick out things that science can't.
10 A. There has been at least one article published
11 I'm familiar with that showed that some canines will
12 detect flammable and combustible liquid levels we're
13 capable of extracting and analyzing.
14 Q. How can you confirm that?
15 A. Well, in these particular tests what had
16 happened was they put down smaller and smaller amounts
17 of flammable and combustible liquids. And they did
18 run a series of canines through the samples with low
19 levels of flammable liquid, as well as negative
20 controls, which are cans of a similar burnt material
21 that do not have accelerant on them. And canines were
22 found to alert properly on the cans that had very low
23 levels of accelerant. These same cans were then

 



Police interviewing techniques
can lead some innocent people
to confess to crimes they did not
commit. (ABCNEWS.com)

# Confused Confessions
## Police Techniques Questioned When Wrong Guy Comes Clean

*By Geraldine Sealey*
NEWS.com
Sept. 25

— The day Corethian Bell discovered his mother's dead body would have
been tragic enough. As it turned out, things only got worse — the grieving
son soon became the prime suspect.



Watch Primetime's report on ABC
Thursday night at 10 p.m. ET.

Chicago police took Bell in for questioning after he called 911 to report his mother's death. At the police station, Bell says
he was held for 50 hours, screamed at, roughed up, and wrongly told he failed a lie detector test. Ultimately, Bell
confessed on videotape to killing his mother.

With that damning evidence, the case would have been closed.

Bell served 17 months in Cook County Jail before forensic evidence saved him. Blood and semen collected at the scene,
and not tested for months, pointed to the guilt of another man.

"Prior to the advent of DNA evidence, Corethian Bell would be languishing in prison, there's no question," said Locke
Bowman, Bell's attorney and the legal director of MacArthur Justice Center.

Now, in a pending lawsuit, Bell accuses his interrogating officers of coercing a phony confession out of him. He's not
alone.

### Bad Confessions in Infamous Cases

Just as DNA evidence has raised questions about traditional crime-fighting tools such as fingerprinting and eyewitness
testimony, a slew of recent cases have shed light on the frequency of false confessions.

Of the 110 exonerations due to post-conviction DNA evidence in recent years, 27 included confessions as evidence,
according to the non-profit legal clinic Innocence Project. "That number is really shocking," said Richard Ofshe, a leading
expert on false confessions and University of California at Berkeley professor. Systemwide, no one knows how often
phony confessions occur.

"In my wildest fears I do not imagine the number can be 20 percent. On the other hand, if that's the result to come out of
the Innocence Project, that's really scary," Ofshe said. Indeed, dubious confessions have surfaced in several recent
exonerations, reopened cases and police abuse lawsuits.

🔲 The infamous Central Park Jogger case, thought long solved, will go to court again in October even though five teens
who confessed already served their sentences. Now, a convicted rapist-murderer says he committed the brutal 1989
rape and beating of a New York City woman. In an interview to air on ABCNEWS' *Primetime* on Thursday, the man,
Matias Reyes, says no one else was involved: "I was alone that night."

a  In Detroit last month, Eddie Joe Lloyd was freed from prison after 17 years for the brutal 1985 rape and murder of a teenage girl. Despite the lack of physical evidence, Lloyd was convicted based heavily on a taped confession he made to Detroit police while he was in a mental hospital.

a  A man who spent more than 15 years in prison before DNA tests exonerated him filed a civil rights complaint earlier this month in Norristown, Pa., against the prosecutors and two former detectives who took his confession.

## Why Admit Something You Didn't Do?

Falsely admitting to a crime may seem unfathomable to those who have never stepped inside a police interrogation room. Experts say the young, old, mentally or emotionally disabled, and people with substance abuse problems are particularly vulnerable to coercion.

In Corethian Bell's case, he suffers from mild retardation and has been diagnosed with paranoid schizophrenia. Grieving his mother's death made him even more susceptible to police tactics, his lawyers say.

"I have read a number of police interrogation manuals and it's clear they've become sophisticated in playing on psychological weaknesses. That's their business, trying to get a confession," said Peter Brooks, a Yale University professor and author of *Troubling Confessions: Speaking Guilt in Law and Literature*. "An effectively carried out police interrogation is well-designed to induce a response."

But under certain circumstances, police techniques could wear down many who may initially believe in the power of their innocence, experts say.

During interrogations, police usually create stress and a sense of urgency. Suspects are often isolated in rooms especially designed for questioning, and may be deprived of food or sleep. "The goal is to break the suspect down," said Saul Kassin, a Williams College psychology professor who has studied false confessions for more than 20 years. "You want the suspect to want to get out of there."

With stress levels elevated, police confront the suspect, accusing him or her of the crime. Often, police falsely represent evidence, perhaps by telling the suspect that his fingerprints were found at the scene, when they weren't, or that he failed a lie detector test or his friends gave him up.

Courts have upheld such police deception of suspects.

"Now the suspect is in a total state of despair," Kassin said. "Denial isn't getting [the suspect] out of [the interrogation]."

## Looking for a Way Out

After hours of isolation, deprivation and accusations, exhausted suspects are often looking for a way out, Kassin said. Here is where police may step in and suggest that the suspect may not have intended to commit the crime, or hint that the consequences might not be harsh if the suspect confesses.

Police may also mention, intentionally or by mistake, certain key details about the crime or crime scene that only the perpetrator could know, confusing the process further. In the Central Park Jogger case, for example, some of the teenaged suspects were shown crime scene photos before they confessed.

Suspects, even when innocent, often confess just to escape their interrogators, and can often weave a story together that shows even they believe in their own guilt.

"What makes someone give a false confession is not that they need a Diet Coke or a Big Mac after however many hours, it's that they become convinced that the best thing to do at the moment is to confess," she said. "Like it or not, you're going to be arrested. Police have evidence they sincerely believe will convict you, and will go to the gas chamber and spend the rest of your life in jail."

For innocent people who confess, the interrogation room is a Twilight Zone experience. They walk in with a naïve belief in their own innocence, and leave in handcuffs having confessed to a crime.

Close to 80 percent of all suspects turn down their right to have a lawyer present during questioning, and innocent

A - 32

P    OK. Exactly. There's reasons upon reasons for things that
     could make things happen. But you've got to acknowledge that
     Mark. You just can't, it just doesn't go away by saying, oh
     I don't know, I don't remember. Listen, you don't remember 1,
     2, 3, 4, 5 and then from 7, 8, 9 and forget 6. That doesn't
     happen. It doesn't make sense.

A    I know it doesn't make sense.

P    OK, and it's not true. The one thing I've done with you, I
     haven't laid any bull on you. I'm not pulling any punches
     with you. I want the same from you. If you honestly want me
     to work with you and be in your corner, I expect the same
     thing from you. I expect you to be honest with me. The heck
     if I'm going to go to bat for somebody that's sitting here
     lying in my face. Like I told you, if I thought you were some
     dirt ball arsonist that wanted to burn a building down, I
     wouldn't even waste my time in here with you. I don't need
     to. Do you understand that? We've already been through who's
     in the apartment and who would have a reason to do what. We
     know no one's broken in, so that part's done. That's like on
     last page. We're moving on to making this what it is. So
     this is your time, Mark. The ball's in your court and that's
     why I'm sitting here. I don't want to paint a picture of you
     being anything worse than what really happened. I could make
     it so awful. This guy was in there pouring something on the
     floor, lit a match, didn't care, new people were in that
     apartment, new people were upstairs. That's not what
     happened.

A    No, it's not what happened.

P    That's exactly right. But we need to know what happened and
     we need to know you're sorry for what happened, because, do
     you know what, if you're not sorry for what happened, then I
     don't want to help you. I'm going to tell you that right now.
     I don't want to help you if you're not sorry. If you don't
     show me any remorse, I don't want to have anything to do with
     you. But you know what, I don't believe that. I don't
     believe that for a second. You know you made a mistake. You
     know you screwed up. You've got to acknowledge that and
     you've got to tell me that you're sorry for what happened.
     You need to tell me that.

A    I can't tell you that.

P    Well, you're not sorry for what happened?

A    I'm very sorry for what happened but I can't tell you that. I
     did it.

A-39

W= Worthy
M= McLucas
P= Preston

Statement: Mark Kirk          42          Case No. 32-96-142759
Det. Rob McLucas
-------------------------------------------------------------------

    through. OK? If you want to throw your job away, if you want
to throw your relationship away with this woman, you want to
do all that, you know, you want to be self-centered, then
that's what you're going to get. OK? You took a paint brush
and you painted yourself into that corner yourself. No one
did it for you. OK? So I'm sorry to say that that's what
you've done. I also know that now I can walk away from this
whole thing and I can breathe easy and I can go on with my
life and you will deal with the consequences because you
painted yourself into that corner. It's a shame. Booze and
woman. Well, I don't know what more to tell you. You ain't
going to tell me what really happened. Is that what you're
going to do?

A    I can't. If I could tell you, I would. I can't. I can't
tell you what I don't know.

W    Well, you just remember, people are dead because of this fire.

A    I know.

W    And you caused it. No one else did it, you did it.

(Bill Preston returns to the room.)

W    Are you all done? Do you want to talk to him?

P    Well, yeah, we are done.

W    OK. I was talking to him and explaining to him some.....

P    I just got authorization to charge you with murder in the
first degree. Murder in the first degree.

W    I told you.

P    Two counts. Arson. Reckless Endangering first degree -
twenty counts. What the hell am I supposed to tell a jury
about you? You're really screwing it up. I'm supposed to go
in there and say you're some cold blooded guy? That's all
I've got.

W    I told you.

P    Murder. Do you understand what we're talking about?

A    Yes I do.

P    What is wrong with you? You're giving me no choice. We've
got to get it straightened out. I have no choice other than

Statement:  Mark Kirk                43              Case No. 32-96-142759
Det. Rob McLucas
------------------------------------------------------------------

     to go in and say, you torched this building and killed people
     on purpose because that's the only out you're giving me.  Is
     that what we're going to deal with?  Cause you're giving me no
     choice but to do that.  You're going to make me stand up there
     and say you're murderer and you did it in cold blood.  Is that
     what happened?  Is that what you are, a murderer?

A     No

P     Well then get it straightened out so we can get this
     straightened out.  Because you're leaving me no choice.  I
     have no out, right now.  I have no out but to go in and tell
     these people that you're a murderer times two, maybe three.
     You're an arsonist, you're a felon.  Is that what we're going
     to do?  Or are you going to get this straightened out right
     now?  Look at me, Mark.  Look at me.  Don't hide your head in
     your hand.  Let's get this, be a man.  Let's get this
     straightened out right now.  Are you a murderer?

A     No I'm not.

P     All right then, get this straightened out.

A     I can't get it straightened out because I can't tell you what
     happened.  I don't know.

P     You know what happened in there.

A     I don't.

P     You do.

A     Don't know what happened.

P     Mark, look up at me and quit burying your head.  Now get this
     straightened out right now.  You were in that place.  You
     started the fire because you were pissed off and that's
     exactly what happened.  You were pissed off at your girlfriend
     because she was screwing around those two guys.  Now own up to
     it so I don't have to go in this jury and tell them that
     you're a murderer in the first degree and you're cold blooded
     and calculated and you did it on purpose.  You're giving me no
     other route other than to say that because I don't know any
     different.  I know you were in there.  I know you started the
     fire on the purpose.  That's the only thing I can say right
     now.  Is that how we're going to deal with this so you go down
     the tubes for the rest of your life for this?  Is that how
     we're going to deal with it?  Let's get this straightened out
     right now.  Look up at me.  I'm not burying my head in my
     hands.  You look at me and let's get this straightened out.

Statement:  Mark Kirk            44           Case No. 32-96-142759
Det. Rob McLucas
---------------------------------------------------------------------

   Is that what you want me to tell these people, that you did
   this in cold blood?

A   No

P   That you meant to torch this building down and it killed those
    people?

A   No

P   And it burned those families out.

A   Nope

P   Or are we going to get this straightened out and you're going
    to tell me what happened now.

A   I can't tell you.....

P   You're full of shit.  You tell me what happened right now.
    You get this straightened out.

A   I don't know.

P   You do know, Mark.  Mark, we've been through it a hundred
    times.  We've been through his, we've been through that.  You
    know what happened.

A   No I don't.

P   Mark, you do.  You do know what happened and I'm not going to
    sit here and argue with you.  OK?  If you want to go down the
    tubes, that's your business.  OK?  I've got a job to do.  My
    job is to say that the fire's intentionally started, OK?  You
    did it.  I've got authorization to charge you with murder in
    the first degree and that's what I'm going to do.  OK?  The
    ball's in your court right now.  OK?  You don't care about
    yourself?  There's not another single person, including me,
    that cares about you a little bit.  Not one person.  OK?  I
    told you before, I didn't sit in here and give you the song
    and dance before, because I don't care.  But if you don't care
    about yourself, nobody else in the world is going to either.
    OK?  You've got to get off of what you're doing and tell me
    the truth here or you're going to go down the tubes.  You got
    it?  Now let's get it straightened out.  Right now.  Let's get
    it straightened out.  I want to know what happened in that
    room, in that kitchen and why you started that fire and I want
    to know right now.  OK?

A   I didn't start it.

A-42

W= Worthy (Detective)
P= Preston
A= Kirk

Statement: Mark Kirk         46      /     Case No. 32-96-142759
Det. Rob McLucas
------------------------------------------------------------------

P    You were drunk, right?

A    Yes

P    OK.  You broke some stuff in the apartment, you were throwing
     stuff around, right?

A    Yes

P    You knocked into the clock, right?

A    Yes

P    And you started that fire on that kitchen top.

A    No

P    You did.  What is so difficult about that?

W    He's telling you _____ on this whole thing so let's
     just deal with him.  I spoke to him at length.

P    You've got what you're going to deserve now.  OK?  You don't
     want to help yourself, Mark, I can't help you.  I tried to
     tell you already, don't make this anything it's not.  OK?
     People have blown this all out of proportion.  OK?  Big thing.
     OK?  Serious thing happened there.  Serious thing happened.

A    I know.

P    But the problem is you're making it worse than it really is.
     And that's what I'm trying to tell you.  You're making this
     something it's not and it's hard to take that back later.  OK?
     It's hard to say you cooperated.  It's hard to say you were
     sorry when you sat here and lied and lied and lied to me about
     it.  It's hard to take those lies back when it comes time,
     crunch time in court, when you want to tell people to feel
     sorry for you and to say, hey, I came clean.  I made a
     mistake.  I didn't mean the place to burn down.  OK?  It's
     hard to say that when everybody's going to know what you lied.
     You kept lying to me.  That's why it's important to get this
     straightened out now.  Not later.  Not tomorrow.  Tomorrow's
     too late.  You're charged.  That's it.  OK?  We're done
     talking.  OK?  You're charged with murder in the first degree,
     twice.

     (tape runs out)

P    ...it's what we're dealing with.  We do it now or you roll the
     dice and see what happens.  I don't think you're going to come

A-42

Statement: Mark Kirk           56           Case No. 32-96-142759
Det. Rob McLucas
-------------------------------------------------------------------

responsible for this fire?

A    I don't know.

M    I can tell you I've posed that question to a lot of people.

A    Uh-huh

M    What do you think they say?

A    Phew.

M    They say death.

A    I know.

M    They say death.

K    What do you think should happen to them?  What do you think
     should happen to somebody did that?

A    What I think?

K    What should happen to somebody who did that fire?

A    I would have to know the circumstances.

K    OK.  First circumstance, they lit that fire cold blooded.  I'm
     going to burn this place down and kill everybody in it now.

A    Then they do deserve the death penalty.

K    OK.  What happens to the guy that's fired up, pissed off at
     his girlfriend because she made a fool of him, just tired of
     the nonsense, packing his shit, getting out of there, fired
     up, drunk, lights a fire out of anger, gets out of control,
     tries to stop it, he can't, and the thing gets up too late.
     the fire's too late.  Can't do anything about it.  What should
     happen to a guy like that?  The guy that had circumstances.
     There's reasons.  A girl has him pissed off.  The guy that
     wants to help himself.  The guy that wants to say, hey,
     look, I'm not proud of what happened.  I screwed up.  I made
     one hell of a mistake.  If I had to do all over again, it
     wouldn't have happened but I messed up.  And I did light a
     fire and here's how I did it.  And I sure as hell didn't think
     this all was going to happen and the next thing I know, this
     place is up and I tried to get people out of there.  I got
     everybody out of there I could.  I even tried to go back in
     there and I couldn't get back in there.  I went to the
     neighboring buildings and tried to get people out of there.

Δ - 1111

K= Kelly                                                      *12-5-1996*
M= McLucas
A= Kirk


Statement:  Mark Kirk            58'              Case No. 32-96-142759
Det. Rob McLucas
--------------------------------------------------------------------

M    And that, I could easily just charge you and walk away from
     you.  But then when I go in there, they ask me about you and
     all I can say is a cold-blooded killer because he said nothing
     to us.  He said nothing to us.  We don't know how he feels
     about this.  He doesn't, we don't know how he feels about this
     8-year-old boy, an 8-year-old boy, you were there once.   I
     don't know how he feels about that.  OK?  When they see you
     and you're emotional and you're telling them listen, I'm
     sorry, I didn't mean this to happen.  OK?  I didn't want this
     8-year-old boy to die.  He's two floors up.  That wasn't the
     intention.  OK?  My intention was to just do some damage and
     it got out of control and I couldn't control it.  It was fire.
     Not something I can stop.  I tried my best.  I went and tried
     to get everybody I could out of this place.  Along with the
     policemen, along with the firemen.  They tried their best to
     get these people out.  OK?  You couldn't do it.  They couldn't
     do it.  But now we have to make it right.  Don't you think it,
     don't think everybody deserves to have it made right?

K    Especially you.  Especially you.  We want this made right for
     you.  We don't want anybody going in there and painting you as
     a bad guy because I don't think you're that way.  I don't.  I
     was with you yesterday.

M    I think just how you're going to deal with yourself.  When you
     sit here and deny it and you have this very selective memory.
     You're very detailed all up until the point that this fire
     happened.

K    The story changes, it changes from this to this.

M    Oh yeah, you've had 18 different versions.  You know that.
     You're going to admit that, right?  I mean, we're all men
     here.

K    There's one version that's consistent, Mark.  It happened.
     This thing happened.  And the thing is....

M    So what we're trying to do....

K    ...got to get this, got to this settled.

A    I know, but, I mean, I....

K    Mark, Mark, Mark, hold on.  Hear me out, please.

A    OK

K    You know, you know and it's tough.  God it's tough.  It's
     tough to get that off.  It's tough to say, yes, I made a

                              A-45

        guy say, hey, here's a guy who screwed up. He didn't need
        this building to burn down. He wasn't trying to hurt your
        family. He wasn't trying to hurt your little brother.

M       And people like you who have no respect for human life and for
        truth and for honesty can rot in jail for the rest of their
        life or get the death penalty for all I care.

K       But I don't think you're that kind of guy, Mark. I really
        don't. I think this kid needs to know....

A       I'm not.

M       But you are.

K       I think these kinds need.....

M       Because we've given you more than an opportunity to tell us
        the truth about everything, to' lay it out and you won't do it
        because you're scared of what's going to happen to Mark.
        You're scared of what's going to happen to Mark. You don't
        give rat's ass about everybody else. You don't want to make
        things right. You're scared of going to jail. You could care
        less about anybody else. You don't give a shit about Darlene.

A       Back up. Back right up. OK?

M       What?

A       I'm pretty sure I'm already going to jail because of them
        other gentlemen already told me that. OK?

K       Mark, you could be charged, listen to me, you could be charged
        with....

A       I know, with murder, with murder.

K       Who said murder?

A       He just told me murder.

K       What did we just tell you?

A       The fire marshall. He said I could be charged with murder.

K       People make mistakes. You can be charged with murder.

A       Now do you think if I had a choice between being charged with
        murder or being charged with reckless homicide or
        whatever.....

                              A-46

K   They couldn't get out.  I tried to go back in there.  I'm
    knocking on other doors in case that fire spreads.  Get those
    people out of there.  Your honor, I screwed up.  Who's the
    bigger man?  Who's the person who's controlling their destiny.
    Who's the person who's trying to make the best of a bad
    situation.

A   I know what you're saying.

K   Of you know what I'm saying, Mark, then come on.  Come on.
    You've got to take it.  You've got to talk about it.  You've
    got to get it off your chest.  Their two scenarios we have
    right here.

A   I know.

K   You're in charge of your destiny here.  You're the one who can
    set it straight.

M   Those are the only two scenarios you have.

K   That's it.  That's it.

M   And this is your opportunity.

K   This is your only opportunity, Mark.

M   Because you won't get this opportunity to speak for yourself.
    After that, everybody else speaks for you.

A   I know.

K   And at that point you can say, oh yeah, I made a mistake.  But
    they're going to think, hey, look, he should have told them
    that back in December.

M   Like I say, he's just, it's just like everybody, when they're
    sitting there in front of the judge and he's getting ready to
    sentence them to death, what's the first thing coming out of
    their mouths?

K   I'm sorry.

M   I'm sorry.

K   I messed up.  I made a mistake.

M   Why didn't you say that six months ago, a year ago.  You're
    not sorry.  You don't care.  You're sorry because you're
    getting ready to die.

A -47

Statement:  Mark Kirk              27            Case No. 32-96-142759
Det. Rob McLucas
-------------------------------------------------------------------

A    I hadn't even left the building.  I hadn't left the building
     yet.    _____

W    You were at the front door.....

A    I didn't even get to the front door.

W    Then where was Jason at?

A    He was at the front door.

W    And you heard him talking about the cat?

A    I heard him talking about the cat.

W    And you were, where were you at when you heard him talking
     about the cat?

A    I was at the bottom of the steps.

W    OK

A    I was at the bottom of the steps.  He was at the top of the
     steps.  Um, and I heard him say, mentioning the cat, I didn't
     realize he was talking to the woman in the first apartment.
     I just heard him say, what about the cat.   You know, the
     cat's still in there.  And then that's when I went back and I
     pushed the door open and the heat came blew on me and I saw
     like a little flame come across the ceiling like that and I
     didn't realize at the time he had opened the sliding glass
     door.   I just it just created a wind tunnel affect right
     through that living room.

W    So once that happened, what did you do when you opened the
     door up?

A    I turned back around and I burned my hand on the door and
     Jason even heard me.  He said.....I, I, I ran over to the
     front door and I was holding my hand like this and I said, I
     just burned my fucking hand.  I just burned hand.  I just
     burned my hand real bad.  And then me and him went out
     together or, I don't remember which, which, but then we was
     all out of the building.  Then we went in the building next
     door and started knocking on doors, me and Darlene.

W    One other thing I wanted to clarify was, this Capt. Morgan
     bottle, right, which is what rum?

A    Uh-huh

A-50

W= Worthy
M= McLucas
A= Kirk

Statement:  Mark Kirk          39          Case No. 32-96-142759
Det. Rob McLucas
-----------------------------------------------------------------

A     I don't know.

W     Well, obviously it's a possibility because you're running it
      through your mind.  Right?

A     In my heart I believe I didn't do it.

W     OK, well, the problem is I, I've went over this time and time
      again with you.  The, do you remember what you did with the
      Capt. Morgan bottle?  See if you remember that part.

A     I thought Tom took it with him.

W     Now, what did you do with the Capt. Morgan bottle?

A     I don't remember having the Capt. Morgan bottle.

W     OK.  Well there's a witness, OK, that came forward.  We have
      the Capt. Morgan bottle.  OK?  Seeing what happened to the
      Capt. Morgan.  I'm trying to test your memory on this.

A     OK

W     OK?  What happened with the Capt. Morgan bottle?  What did
      you do with the Capt. Morgan bottle?  I just want to see if
      you're truthful with me on that part.

A     I'm being truthful.  I don't....

W     No, just on that part there.  I just want to see....

A     On what part?

W     On the Capt. Morgan bottle.

A     I don't know if I ever had, I didn't have, I'm telling you, I
      thought Tom took the Capt. Morgan with him.  I really thought
      he took it with him.

W     So if it's found nearby with your fingerprints on it, you
      can't explain that then?

A     Yes I can.  We, I was drinking out of it.

W     But where it was put, you don't know where it was put?

A     No I don't.

W     OK.  Well, sorry to say you're going to take the hard end of
      this deal.  I've sat here and tried to talk with you at

        K= Kelly (Detective)
        M= McLucas (Detective)
        A= Kirk

Statement:  Mark Kirk          67          Case No. 32-96-142759
Det. Rob McLucas
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

K    We're you near it with the alcohol?  Talk to me about that.

A    I told you honestly, I thought Tom took the shit with him.

K    Tom didn't take it.  That's established.

A    OK

K    Tom did not take it.  The alcohol's in the house.

A    The alcohol's in the house.

M    What should I tell the Attorney General's Office about you
     when I present this case?

A    I don't know.

M    Cause I've got to get passed all this because I've got a job
     to do, obviously.

K    That's it, we're trying to work with you here.  I mean....

M    You tell me what I'm supposed to say about you.

K    And L'm going to tell you right now, I don't remember isn't
     going to cut it.

M    Because if you can't think of anything for me to say about
     you, I mean, I'm coming to you.  You're the one that can speak
     for yourself.

A    I-know.

K    Let's speak for yourself, Mark.

M    I-don't do this too often for people.  What should I tell
     them?

K    Speak for yourself

A    I don't have anything to tell you.  You don't believe me.
     (crying)

K    Mark, we need the truth, man.  You need to get this off your
     chest.  It's tough, Mark.  It's tough.

A    (crying)

K    Bert's dead.  That little boy is dead.

A - 52

K= Kelly
M= McLucas
A= Kirk

*12-5-1996*

Statement:  Mark Kirk            61            Case No. 32-96-142759
Det. Rob McLucas
-----------------------------------------------------------------------

A    A fair punishment for me?

M    Uh-huh.  Honestly.  I just want an honest opinion.  You don't
     have to tell me whether you did it, you didn't do it,
     whatever.  Just tell me what you think is an honest punishment
     for you.

A    I don't believe I killed them people.  OK?  I don't believe I
     killed them.

M    What do you think killed those people?  Do you know what?  I
     don't think you killed those people either.  I think the fire
     killed those people.  OK, and that's something you need to
     understand.  There's a lot of us here that don't think that
     you killed people.  OK?  A lot of people do think you did.  I
     think the fire did and you tried what you could do.

K    You did the best you could.  You tried but that fire was out
     of control.  You're not a firefighter.  You don't know what
     the heck happened.  That thing took off quick.  You tried to
     help people.  You tried to do the right thing.

M    What should happen to you?  What's a fair punishment?

A    I don't know because I don't believe I started it.

K    Well Mark...

A    I've gone over and over and over and over and over in my mind.

K    It's like when you were in the living room with your bag, you
     packed your bag, you go into the living room.

A    Uh-huh

K    You went in that kitchen.  You went in that kitchen.  You had
     that bottle of Morgan.  What did you do with it?  What did you
     do, Mark?

A    I'm thinking.

K    Come on.  You don't know, you know, Mark.  You were there.
     It's hard to get out.  It's hard to get off your chest, Mark.

M    Focus yourself.

K    Once it's out, it's out.  There will be no more covering up.
     No more trying to bury it cause you can't bury it.  It's not
     going to go away.  This happened.

A-57

Statement:  Mark Kirk          63          Case No. 32-96-142759
Det. Rob McLucas
------------------------------------------------------------------

M    I was in my house.  OK?  Could you definitely say without a
     possibility that you didn't do this?  During all that gray
     area that you have difficulty remembering, is there a
     possibility that you were so drunk that you got, something
     happened and you started a fire?

A    It's possible I may have accidentally started it.  That's very
     possible.

M    OK  Then how could you have accidentally started the fire?

A    I'm not going to say I did when I believe I didn't.

M    OK.  You need to help me here.

A    OK

M    I need to know how a fire like that could have accidentally
     started.  A lot of times when we're dealing with people, we do
     in, see, if we didn't need to talk to people to figure things
     out, we wouldn't be talking to you.  We'd just charge.  We
     wouldn't talk to witnesses.  We wouldn't talk to victims when
     they're alive.  We wouldn't talk to the other people in the
     apartment complexes because we've got to know what they saw,
     what they did and how these things happen.

A    Uh-huh

M    How could this fire have been started accidentally?

A    Um, phew, I mean, somebody may left that bad burner on.

K    Nope, the burner's on.  That's no doubt.

A    Right, that's what the fire marshall told me that the burner
     was on.

K    The burner is just not going to do it.  Something had to be
     added to that scene.  Something had to be added to that burner
     to make it burn.

M    Could you have been angry and just turned the burner on but
     did nothing else?

A    I could have turned it on and lit a cigarette.

K    OK

A    It's very possible and left it on.

$Ex - 54$

M= McLucas
A= Kirk

Statement:  Mark Kirk          64          Case No. 32-96-142759
Det. Rob McLucas
---------------------------------------------------------------------

M    But could you....

A    Because, I mean, like I said, all the kids and Darlene told
     you that she reported that the burner had caught fire.

K    We're not talking about, that was not an electrical fire.  OK?
     The fire was the burner and something was added to that burner
     to make the fire.  That's the bottom line.

A    I can't imagine what.

K    Did you spill something on the burner?  When you were pissed
     off at Darlene and you were packing your stuff, getting out of
     there, you dropped something, spilled something and things
     happened like that.

M    Maybe you had something in your hand.  Maybe you were......

K    There's no doubt that you were mad at her, rightfully so.

A    I know, I know.

M    I've been over, I've talked to the guys over at the Marlex and
     they were embarrassed by it.  I talk to the guy who had a
     tattoo on his neck.  Remember when you were over the Marlex?

A    The guy with the tattoo?

M    Yeah.

A    Oh, red head?

M    Yeah

A    Kid?

M    Yeah, he was embarrassed for you.  I mean, he couldn't believe
     what Darlene was doing and that's the honest truth.  He was
     offended by it.  He was insulted by it and he said, I can
     imagine what he felt like.

K    See, everybody knows that.  Everybody knows that.  The thing
     is, what could have happened with the burner.  What could you
     have dropped on that burner?

A    I don't know.

K    Come on, Mark.  Something was on that burner.  You were pissed
     at her and rightfully so and the next thing you know this
     burner gets turned on and something gets added to this burner

Ex-55

Statement:  Mark Kirk              66              Case No. 32-96-142759
Det. Rob McLucas
------------------------------------------------------------------------

K    You can remember, Mark.  You're the only one who can remember.
     You can remember doing it, Mark.  You can remember doing it.

M    Explain it to me that, just up to it.  You remember all the
     details about breaking the clock and arguing with her.

A    No, I don't remember breaking the clock.  Everybody told me I
     broke the clock.  I don't remember breaking the clock.  I love
     that clock.  I'd never break that clock, ever, ever.  So, no,
     I don't remember breaking the clock.  Everybody told me I
     broke the clock.

K    Do you remember fighting with Darlene?

A    What?

K    Do you remember fighting with Darlene?

M    Cause you remember being pissed off at her.

A    Like, I remember being pissed off.

K    OK

A    I don't remember packing clothes.  I do remember she knocked
     me on the bed and she jumped on top of me and I pushed her on
     the floor.  I remember going into the bathroom.

K    You didn't go in the bathroom, Mark, because we talked about
     that.  We talked about that yesterday at length.  You said you
     were not in the bathroom.  You told me you were on the other
     side of the bed by the, by the, your dresser.  OK?  And you
     weren't even there because Darlene didn't see you there.
     Darlene says there's a period of time where she had no idea
     where you were and that's when you were out in the living room
     or in the kitchen.  I don't know if you were getting a beer.
     I don't know what you were doing out there but you were out
     there, Mark.  And when you were out there, something happened
     to that burner, that fire got turned on and something was put
     on that burner or spilled on that burner, whatever, and that
     fire started.  That's how it went down, Mark.  That's how I
     think it went down.

A    I don't know.  I don't know.

K    You were there.

A    I don't know if I spilled the fucking alcohol.  I don't know.
     I don't know.

Ex -56

Statement:  Mark Kirk                117              Case No. 32-96-142759
Det. Rob McLucas
-------------------------------------------------------------------

fuming.

A     Uh-huh

M     You go as far, you get so angry once these guys leave, these
      guys leave, that you go and you damage this clock.

A     Uh-huh

M     You're one true, prize possession.   Is that correct?

A     Yes

M     I mean, that's, from listening to you and talking to you
      throughout these interviews, there's not too many things that
      have meant anything to you but this clock.  For some reason,
      this clock has gone where you've gone.  Some people may take,
      you know, a lucky silver dollar or something else.  You take
      a big old clock with you.  OK?  So it obviously meant
      something to you.  You're so angry that you're going to damage
      that clock.  OK?  Then you get in this dispute with her again.
      She's trying to get you to stay.  You push her off the bed,
      she falls on the ground.  You pack your stuff up.  You're
      done, you're leaving.  OK?  And then you say that this fire
      accidentally starts when you try and light a cigarette.   I
      don't believe that's true.  OK?  And this is where, I mean,
      you're being honest with me.  You've got to tell me the truth
      because the Fire Marshall's Office says it's not a, it's not
      a, it doesn't accidentally spill there.  It's not where you
      leaned over and just a little bit came out and made it flash.
      This stuff was poured all over the, all over the stove.  OK?
      You need to tell me the truth.  You're working good.  The only
      way that I can say anything good about you, OK, cause you know
      you're in deep.  You already know that.  The only way that I
      can say anything good about you, is if you come forth and tell
      me the truth.  Because you know as well as I do, that for me
      to say anything positive about you, I have to know that you're
      telling me 100% the truth cause I won't say anything about you
      cause I'm not going to put my butt on the line.  I'm not going
      to back you and them say, well, it's a lie.  Fire Marshall
      says this is, you know, he poured this stuff all over.  You've
      got to tell me the truth.  I know it wasn't an accident.  I
      think you were mad.  You got mad at her and it went a little
      bit too far.  I know you didn't intend for anybody to get hurt
      or anybody to die.  But tell me the truth about the fire.
      Come on, Mark.  You're doing good.  You're talking to me.

A     (sobbing)

M     You're going to feel better.  Talk to me.

A-57

Statement:  Mark Kirk          113          Case No. 32-96-142759
Det. Rob McLucas
------------------------------------------------------------------

     the front door for that woman and I heard him say something
     about the cat.  I turned back around, ran back to go in and
     see if I could get the cat and that was when I burned my hand.


M    What did you burn your hand on?

A    On the door.

M    Do you know what part of the door?

A    I just, I pushed the door like that.    (crying)

M    What do you see when you push open the door?

A    I saw a lot of smoke bellowing.

M    What color was the smoke?

A    Black, pitch black.  I felt the heat.  I mean, just, the heat
     just like blew right by me and I saw like a little flame, like
     it licked the ceiling and I couldn't even get, I mean, I
     couldn't go in so I didn't even try so I just turned back
     around and ran out of the complex.

M    I want to touch on the Capt. Morgan bottle.  Try and think
     real clear about that.  Were you afraid of what someone would
     think about the Capt. Morgan bottle?  Can you remember what
     you did with it?

A    I can't remember what I did with it.  I really can't.

M    Earlier when we were talking to you, when me and Det. Kelly
     were talking, you indicated something about outside, Capt.
     Morgan bottle may be outside or something like that.  Why did
     you think that?

A    Because the fire marshall told me he found it outside or
     something.

M    When did he tell you that they found it outside?

A    When we were interviewing today.

M    Did he say where at outside?

A    No

M    Where do you think it was found outside?

A-58

12-5-1996

K= Kelly
M= McLucas
A= Kirk

Statement:  Mark Kirk              68              Case No. 32-96-142759
Det. Rob McLucas
------------------------------------------------------------------------

A    I know.

K    OK.  We know who did that?

A    Robbie

K    Well they call him Bert.  OK?  Robbie's dead and the thing is,
     the person who murdered that boy is either a cold-blooded
     murder or it was an accident that happened.  That's the bottom
     line.  Someone wanted to kill everyone in there or somebody
     did something that got out of control.  But someone's sitting
     here saying it's possible that I did it but I don't remember.
     That's not going to get it, Mark.  That's not going to get it
     at all.  You know what happened.  I know that for sure and
     you've got to get it off your chest, Mark.  We're giving you
     every chance to get this out in the open and talk about it....

A    I know but I can't tell you what I don't know.

K    I want you to do it for yourself.

A    I can't tell you what I don't know.

K    You can.  You say you may have spilled something on the
     burner.  Do you remember spilling anything on the burner?

A    No, I don't remember spilling anything on the burner.

K    OK

A    I don't...

K    What did you do with the bottle after it was gone?  Were did
     you take the bottle?  Where did you put the bottle?  Do you
     remember going outside?

A    No

K    Think hard.  After you left that bedroom, Darlene's on the
     floor, and you go outside.

M    Maybe you wanted to go out and get some air, cool off.  You
     walk out to your car, do you walk out back, what do you do?

A    Don't know.  I really don't know.  That's what scares me the
     worst, OK?  I don't know.

M    I don't think that would scare me the worst.

K    It's easy to say I don't know.  But it's hard to say, I know,

 1   and Darlene were both centers of the investigation,

 2   but him more so than her.

 3        Q.   Now, you indicated it was your belief that

 4   until he had given his final verification of what

 5   occurred that day that he was not under arrest; you

 6   didn't consider him to be in custody?

 7        A.   I did not, no.

 8        Q.   Isn't it true he asked to use the bathroom?

 9        A.   That's correct.  He was allowed to use the

10   bathroom.

11        Q.   Okay.  And he asked -- approached you folks

12   to get him sodas and things of that nature; is that

13   correct?

14        A.   Specifically, I don't know.  I asked him if

15   he wanted to eat at about 4:11 in the afternoon.  He

16   told me "No."

17             I know he was provided with sodas.  He was

18   allowed -- he smoked on several different occasions.

19   He was taken to the bathroom.  He was subsequently --

20   later asked for food.  He was provided food.

21        Q.   Isn't it true there were two officers -- one

22   or two officers posted outside the door of the

23   interview room at all times?

A-60

Kelly - Direct                              117

1        MR. ROBERTS:  Nothing further.

2                     - - -

3               CROSS-EXAMINATION

4                     - - -

5    BY MR. RADULSKI:

6        Q.   Good afternoon, Detective.

7        A.   Good afternoon.

8        Q.   When Mr. Kirk asked to use the bathroom, I

9    understand that an officer took him to the bathroom;

10   is that correct?

11       A.   Yes.

12       Q.   Okay.  He wasn't just, "Look, it's down the

13   hall, three doors to the right"?

14       A.   No.  Actually about three doors on the left.

15   It's not that far down where he was brought to that

16   area.

17       Q.   He was taken by someone to the bathroom?

18       A.   Which is standard procedure any time anyone

19   is in the building.  We have to accompany them.

20       Q.   Okay.  Is it a fair statement that during

21   your interview with Mr. Kirk, the idea of Darlene

22   flirting with one of the two people who they were with

23   that evening was first brought to Mr. Kirk's attention

$\mathcal{A}$ - $\mathcal{61}$

W= Worthy (Det.)                                      12-5-1996
A= Kirk

Statement:  Mark Kirk              40         Case No. 32-96-142759
Det. Rob McLucas
-----------------------------------------------------------------------

   length.

A  I know you have.  I, I, I, I _____

W  I know, you know, um.....

A  You think I'm just sitting here trying to lie or something and
   I'm telling you.....

W  You know, years from now, you know, when you're sitting around
   saying, man, I'd have told them guys, you know, I wish I'd
   have told them, you know.  I wouldn't have been in such a jam,
   in such serious matters.  You talked about those things at
   length.  I'm not going to keep going over this with you.
   Might as well just get your day on a roll and just move on to
   the next step.  I'm gong to turn you over to the chief
   investigator.  Let him handle his case however he's going to
   deal with it at this point, you know.  Because I've tried.
   Yesterday, you had all the conflicting stories and everything
   else and, you know, today was your opportunity to talk about
   how it really happened.  You're saying that you don't
   remember, you know.  There's a possibility but you're not
   sure, you doubt it.  And we know for a fact that it wasn't
   her.  We know for a fact that it wasn't the kids.  You know,
   have I threatened you in any fashion?  Have I physically
   abused you in any fashion?

A  No

W  And I let you use the bathroom when you wanted to use the
   bathroom.  They let you smoke when you wanted a smoke.  They
   let you drink stuff when you wanted to drink.  I mean, I'm not
   being harsh with you in any manner.

A  I know you're not.  I know you're not.  I know you're not and
   I....

W  I mean, nobody's done anything to force you to do anything.

A  I know.

W  We've talked to you in a civil manner.  We've tried to just
   rationalize this whole thing with you and it just, it appears
   that we can't get through to you so the next thing is just to
   flip you on into the system and let them deal with it and we
   walk away with clear consciences because we sat and tried to
   talk to you at length and it didn't do no good.  OK?  And the
   shame of the matter, this whole shame of the matter, the whole
   thing, is it all comes back to booze and a woman because you'd
   have never been angry.  And everything in the case indicates

A-62

M= McLucas
A= Kirk
Q= ?

Statement: Mark Kirk                    90              Case No. 32-96-142759
Det. Rob McLucas

---------------------------------------------------------------

A     You know what I really want to do, is, if I'm going to be
      charged, just go ahead and get it over with.

M     You don't think you're going to be able to remember anything?

A     (crying)  Just get it over with.

M     Have you remembered anything else?

A     Nothing.  I can't.

*audio* → (tape ends)

*video D goes to M.*
*On tape, speaks to.*
*door, someone, can't leave*

M     Anything else?

A     No, what time is it?  Do you know?

M     Uh, about 4:15

*McLucas not in room*

A     4:15?

M     Uh-huh.

A     I got here at 9 o'clock.  I have not been here all day.

M     Uh-huh.

A     Oh, see please, are you kidding me, have I been here that
      long?

M     Uh-huh.  Three hours for that test.  Over 3 hours.  I'll be
      right back with you.

A     All right.

(Det. McLucas leaves the room.)

A     God damn, I have been here all day.  Get the fuck out of here.
      Let's go.

(Det. McLucas returns.)

Q     Be right back with you, all right?

A     Uh-huh.

(Det. McLucas leaves the room.)

A     Oh shit.  God damn it.

A- 63

Statement:  Mark Kirk          96          Case No. 32-96-142759
Det. Rob McLucas
-------------------------------------------------------------------

A    You've got to believe me.  I didn't.

Q    My kids some way before you.

A    You've got to believe me.

Q    Next time I meet a man, I'm going to get to know him.  I made
     a big mistake rushing into a relationship.

A    Oh God, they turned you against me.

Q    Yeah, they did turn against you because doesn't it all point
     against that remark, come on.

A    Baby, it had to be an accident.  I swear.

Q    Well if it was an accident, remember and tell them it was an
     accident.

A    I'm trying   i swear I'm trying.  I swear to God.

Q    Well you're going to have to think a little bit harder on it
     because I'm going to have to go.  I've got things to do.  Just
     keep thinking and tell them, if it was an accident, tell them
     it was an accident.  It's lot better than saying you were
     intent....like you're a killer.

A    1 know.

Q    Like you  intentionally  wanted  to  kill  everybody  in  the
     building.

A    I know.  I know.

Q    You'd better get yourself a lawyer too.  All right?  I'll see
     you later.

A    Bye

(Darlene leaves the room.)

(Mark gets up and opens the door.)

A    Can you ask Mike if I can use, can I use your bathroom,
     please?              Still have guard outside door

M    Um, well she wants to leave.  She had one more thing she
     wanted to......

A    OK

A-64

B
SATURDAY
APRIL 7, 2007
The News Journal
WILMINGTON, DEL.

Updates and latest news:
www.delawareonline.com

# Local&Business

News tips: 324-2882 or newsdesk@delawareonline.com •

**ONLINE POLL**
www.delawareonline.com
**Q. Do you think malls should impose curfews for teen**
YESTERDAY'S QUESTION
HBO's 'The Sopranos'?
Q. Do you plan to watch the final
Yes: 21.6%, No:78.4%
UNSCIENTIFIC POLL, TOTAL VOTES 141

## State fire marshal abruptly resigns post

### Move took commission members by surprise; no reason given for departure

By TERRI SANGINITI
The News Journal

Delaware State Fire Marshal Willard F. Preston III resigned from his post Thursday during an executive session of the state Fire Prevention Commission, officials confirmed Friday.

Commission members said the sudden resignation came as a shock.

Assistant State Fire Marshal Grover P. Ingle has been appointed acting state fire marshal until a replacement can be found, officials said.

Fire Commissioner Willard

Betts said the meeting was requested by Preston and was held in executive session reserved for personnel issues.

The session was not open to the public.

"We got his letter of resignation at the executive meeting," Betts said. "It kind of caught us off guard."

State Fire Prevention Commission Vice Chairman Marvin Sharp said Preston, who was appointed in 2001, resigned for personal reasons.

"It was a personal decision conducting fire investigations and serv-
ing as the agency's public infor-

nation."

Preston could not be reached for comment Friday.

Calls Friday to other members of the Fire Prevention Commission were not returned.

"He did an excellent job," Betts said. "He's a close personal friend to a lot of us. This came as a surprise."

Preston, 50, joined the state Fire Marshal's Office in November 1989 and rose to the position of Assistant Chief Deputy Fire Marshal in 1994, conducting fire investigations in New Castle County and serv-

mation officer.

In July 2001, he was appointed state fire marshal, succeeding Daniel Kiley in the position in which he served for 10 years.

Preston, who started his fire career at age 16 with the Talleyville Fire Company, is a member of the International Association of Arson Investigators, National Association of State Fire Marshals and serves as a principal member of the National Fire Protection Association's Technical Committee on Fire investigations.

During his tenure, Preston

completed his law studies at Widener University School of Law and is a member of the bar of the Supreme Court in Delaware and New Jersey.

"We will be going through the hiring process according to state personnel," Sharp said. "We're going to advertise for 30 days from the date of posting."

Preston's successor will be chosen from a pool of candidates from Delaware, Betts said.

The next regularly scheduled meeting of the state Fire Commission is scheduled for April 24, according to the agency's Web site.

Contact Terri Sanginiti at 324-2771 or
tsanginiti@delawareonline.com.



The News Journal/SCC
**Willard F. Preston III had**
**as Delaware's fire mars**
**since 2001.**

## Certificate of Service

I, _Mark Kirk_ ,hereby certify that I have served a true

And correct cop(ies) of the attached: _Petition for Writ of Habeas_

_Corpus Memorandum w/ exhibits_ upon the following

parties/person (s):

TO: _Donald R. Roberts, DAG_         TO: _____

_Dept. of Justice_                   _____

_820 N. French St._                  _____

_Wilmington, DE_                     _____

_19801_                              _____

TO: _____                 TO: _____

_____                     _____

_____                     _____

_____                     _____

_____                     _____

**BY PLACING SAME IN A SEALED ENVELOPE**, and depositing same in the United States Mail at the Delaware Correctional Center, Smyrna, DE 19977.

On this _26 th_ day of _February_ ,200_8_

_Mark Kirk_

t/M: *Mark Kirk*

SBI# 291259  UNIT 5-1

DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



U.S. Dist. Ct. of Del.
Boggs Federal Bldg.
844 King St., Lockbox 18
Wilmington, DE
19801